FOREST CITY ENTERPRISES, INC., APPELLANT, *v.* CITY OF EASTLAKE, APPELLEE.

(No. 73-901—Decided March 19, 1975.)

*Messrs. Thompson, Hine & Flory, Mr. William D. Ginn, Mr. Michael M. Hughes* and *Mr. Stephen L. Buescher,* for appellant.

*Messrs. Andrews & Illenberger* and *Mr. J. Melvin Andrews,* for appellees.

PAUL W. BROWN, J. Appellant challenges the validity of Section 3, Article VIII of the Eastlake City Charter, which provides that no ordinance changing land use becomes effective until ratified by 55 percent of the voters in a city-wide election. Because such provision denies appellant due process of law, we hold it unconstitutional.

I

Since *Euclid* v. *Ambler Realty Co.* (1926), 272 U. S. 365, the constitutionality of zoning has not been questioned. Modern authorities agree that some restrictions on the use of land are essential to orderly community development. But because the power to zone infringes upon the individual use of private property, the exercise of such authority has been carefully hedged with procedural and substantive safeguards. To be sustained as valid, a zoning ordinance must be comprehensive in nature, must bear a reasonable relationship to the public health, safety, welfare, or morals, and must provide for the amelioration of unnecessary hardships imposed upon the owners of specific property.

In Ohio, the power to zone or rezone, via the passage or amendment of a comprehensive zoning ordinance, is clearly a legislative function. *Berg* v. *Struthers* (1964), 176 Ohio St. 146; *Tuber* v. *Perkins* (1966), 6 Ohio St. 2d 155; *Donnelly* v. *Fairview Park* (1968), 13 Ohio St. 2d 1. See also, Justice Corrigan's concurrence in *Mobil Oil Corp.* v. *Rocky River* (1974), 38 Ohio St. 2d 23, 31. As such, the zon-

ing or rezoning of property is subject to the referendum process. *Hilltop Realty* v. *South Euclid* (1960), 110 Ohio App. 535.

Grants of relief from unnecessary hardship, on the other hand, are classified as administrative acts, regardless of the label placed on them. *Donnelly* v. *Fairview Park, supra; Myers* v. *Schiering* (1971), 27 Ohio St. 2d 11. See also, Justice Corrigan's concurrence in *Mobil Oil Corp.* v. *Rocky River, supra.* This is so because the action executes or administers a zoning ordinance, rather than brings it into existence. *Donnelly* v. *Fairview Park, supra.* Whether such administrative relief is provided by council, acting in an administrative capacity, or by an administrative zoning board, created pursuant to R. C. 713.11, the proper route of appeal is to the Court of Common Pleas, via R. C. Chapter 2506. The power to referend an administrative zoning determination, by whatever body made, has long since been foreclosed. *Myers* v. *Schiering, supra.*

## II

Section 3, Article VIII of the Eastlake charter sets forth the procedures prerequisite to a zone or land-use change in that city. Those procedures specifically govern "any change" in existing land use, or "any change whatsoever to any ordinance," or "the enactment of any ordinance," affecting the use of land. Several steps are required to effectuate a proposed change.

First, the proposed change must be submitted to the City Planning Commission, which has the power to approve or disapprove the change. Next, regardless of the action taken by the Planning Commission, the proposal goes to city council, which may approve or disapprove. Finally, if the approval of council has been obtained, the proposed change must be ratified by 55 percent of the voters of Eastlake, at the next regular municipal election, or at a special election falling on the generally established election day. The cost of this required election, including the cost of the requisite advertising, must be borne by the applicant. In their briefs, and during oral argument, the parties have characterized the election requirement as a "mandatory referendum."

Under the provisions of Section 3, Article VIII, *all* changes in land use require approval by city council. On its face, the charter provision makes no distinction between those changes made by council in an administrative capacity, and those made by council in a legislative capacity. Thus, the requirement of a mandatory referendum falls upon all changes with equal weight. Insofar as this purports to mandate a referendum as to an administrative determination, it is clearly invalid. *Myers* v. *Schiering*, *supra; Kelley* v. *John* (1956), 162 Neb. 319, 75 N. W. 2d 713.

Paragraph one of the syllabus in *Myers* states: "Under Section 1f of Article II of the Ohio Constitution, municipal referendum powers are limited to questions which municipalities are 'authorized by law to control *by legislative* action.'"

However, construing the mandatory referendum requirement as applying only to those land-use changes granted by council acting in a legislative capacity, we must determine whether such a requirement denies appellant due process of law.

### III

Appellant has not claimed, nor does the record indicate, that the zoning of appellant's 8-acre parcel for industrial use is unreasonable and unconstitutional. Rather, appellant's narrow claim is that Eastlake's charter provision constitutes a delegation of legislative power to the people, and *as such* violates the requirement that the police powers be exercised in a reasonable and unarbitrary fashion. The focus of our inquiry, then, is whether Eastlake's mandatory referendum provision allows the exercise of legislative power by the voting public, such that zoning regulations might be imposed which are arbitrary and unreasonable.

The Supreme Court of the United States has addressed this issue. In *Eubank* v. *Richmond* (1912), 226 U. S. 137; *Thomas Cusack Co.* v *Chicago* (1917), 242 U. S. 526; and *Washington, ex rel. Seattle Title Trust Co.,* v. *Roberge* (1928), 278 U. S. 116, that court established guidelines by

which an appropriate due process determination might be made.

In *Eubank*, a Virginia statute authorized city and town councils to enact regulations concerning the building of houses, including the establishment of building lines. Pursuant to such authority, Richmond's city council passed an ordinance providing "that whenever the owners of two-thirds of the property abutting on any street shall, in writing, request the committee on streets to establish a building line on the side of the square on which their property fronts, the said committee shall establish such line * * *." Two-thirds of the property owners on plaintiff's block filed such a request, and a building line was subsequently established. When plaintiff challenged that action, the Virginia courts sustained both the statute and the ordinance, finding neither "unreasonable nor unusual."

The United States Supreme Court reversed, holding the ordinance to be an unlawful delegation of legislative power. In analyzing the facts, the court declared, at 226 U. S. 143–144:

"It [the Richmond ordinance] leaves no discretion in the committee on streets as to whether the street line shall or shall not be established in a given case. The action of the committee is determined by two-thirds of the property owners. In other words, part of the property owners fronting on the block determine the extent of use that other owners shall make of their lots, and against the restriction they are impotent. This we emphasize. One set of owners determines not only the extent of use but the kind of use which another set of owners may make of their property. In what way is the public safety, convenience or welfare served by conferring such power? The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the property rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest or even capriciously.

Taste (for even so arbitrary a thing as taste may control) or judgment may vary in localities, indeed in the same locality. * * *

"We are testing the ordinance by its extreme possibilities to show how in its tendency and instances it enables the convenience or purpose of one set of property owners to control the property right of others, and property determined, as the case may be, for business or residence—even, it may be, the kind of business or character of residence.* * *"

In *Cusack*, a Chicago ordinance prohibited the erection of any billboard or signboard in any block "in which one-half of the buildings on both sides of the street are used exclusively for residence purposes without first obtaining the consent in writing of the owners * * * owning the majority of the frontage of the property on both sides of the street in any block in which such billboard or signboard is to be erected * * *." Plaintiff, relying on *Eubank*, challenged the ordinance as an unlawful delegation of legislative power, but the Supreme Court of Illinois upheld the enactment, and the United States Supreme Court affirmed.

The court drew a sharp distinction between *Eubank* and *Cusack*, because the facts presented were significantly different. In *Eubank*, a reasonable use of property was prohibited by arbitrary fiat; in *Cusack*, an unreasonable use of property was prohibited by valid legislative action, subject to said prohibition's being lifted by those affected. As the court noted, at 242 U. S. 531:

"* * * [the *Eubank* ordinance] left the establishment of the building line untouched until the lot owners should act and then made the street committee the mere automatic register of that action and gave it the effect of law. The ordinance in the case at bar absolutely prohibits the erection of any billboards in the blocks designated, but permits this prohibition to be modified with the consent of the persons who are to be most affected by such modification. The one ordinance permits two-thirds of the lot owners to. impose restrictions upon the other property in the block,

while the other permits one-half of the lot owners to remove a restriction from the other property owners. This is not a delegation of legislative power, but is, as we have seen, a familiar provision affecting the enforcement of laws and ordinances.''

Finally, in *Washington, ex rel. Seattle Title Trust Co.*, v. *Roberge*, the trustee of a philanthropic home sought to replace an existing building with a new and enlarged structure, sufficient in size to lodge 30 persons. A Seattle ordinance, amending the city's comprehensive zoning scheme, permitted the erection of the structure as contemplated, but made such approval subject to the trustee's obtaining the written consent ''of the owners of two-thirds of the property within four hundred (400) feet of the proposed building.'' When the trustee failed to comply with the consent requirement, a permit to erect the new home was denied, and the validity of such action was affirmed by the state Supreme Court.

The United States Supreme Court reversed, holding that the consent requirement constituted an unlawful delegation of legislative power. The court distinguished *Cusack* by finding construction of the home in *Roberge* to be a reasonable use, subject to arbitrary prohibition via the consent requirement, while the ordinance in *Cusack* prohibited an unreasonable use unless consent was given. At 278 U. S. 121-122, the court declared:

''The right of the trustee to devote its land to any legitimate use is properly within the protection of the Constitution. The facts disclosed by the record make it clear that the exclusion of the new home from the first district is not indispensable to the general zoning plan. And there is no legislative determination that the proposed building and use would be inconsistent with public health, safety, morals or general welfare. The enactment itself plainly implies the contrary. The grant of permission for such building and use, although purporting to be subject to such consents, shows that the legislative body found that the construction and maintenance of the new home was in harm-

ony with the public interest and with the general scope and plan of the zoning ordinance. The section purports to give the owners of less than one-half the land within 400 feet of the proposed building authority—uncontrolled by any standard or rule prescribed by legislative action—to prevent the trustee from using its land for the proposed home. The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the trustee to their will or caprice. *Yick Wo* v. *Hopkins,* 118 U. S. 356, 366, 368. The delegation of power so attempted is repugnant to the due process clause of the Fourteenth Amendment. *Eubank* v. *Richmond,* 226 U. S. 137, 143. *Browning* v. *Hooper,* 269 U. S. 396.''

The distinction to be drawn between the court's decisions in *Eubank* and *Roberge,* on the one hand, and the court's decision in *Cusack,* on the other, is this: A reasonable use of property, made possible by appropriate legislative action, may not be made dependent upon the potentially arbitrary and unreasonable whims of the voting public. Such a rule was announced by the Supreme Court of Delaware in *Myers* v. *Fortunato* (1920), 12 Del. Ch. 374, at page 375:

''If the existence of the law depends upon the vote or act of the people it is an unconstitutional delegation of legislative power, but if the law is complete in and of itself the fact that it provides for the removal or modification of its prohibition by the act of those most affected thereby, does not make it a delegation of legislative power.''

The facts in the present case parallel those in *Roberge.* Here, the city council of Eastlake, by appropriate legislative action, permitted the use of appellant's 8-acre parcel for multifamily high-rise apartments. But before such ordinance and the use there allowed could become effective, appellant was required to obtain the consent of 55 percent of Eastlake's voting public, in a mandatory referendum.

No standards were established whereby that action would be reasonable, rational and unarbitrary. Nor, indeed, could any be. Applying the principles enunciated by the Supreme Court, the Eastlake referendum requirement denied appellant due process of law.

Due process of law requires that procedures for the exercise of municipal power be structured such that fundamental choices among competing municipal policies are resolved by a responsible organ of government. It also requires that a municipality protect individuals against the arbitrary exercise of municipal power, by assuring that fundamental policy choices underlying the exercise of that power are articulated by some responsible organ of municipal government. *McGautha* v. *California* (1971), 402 U. S. 183, 256, 270. The Eastlake charter provision ignored these concepts and blatantly delegated legislative authority, with no assurance that the result reached thereby would be reasonable or rational. For these reasons, the provision clearly violates the due process clause of the Fourteenth Amendment.[3]

## IV

To support its proposition that Section 3, Article VIII of its charter is constitutional, appellee cites *James* v. *Valtierra* (1971), 402 U. S. 137. That case concerned a state constitutional provision requiring that no low-rent housing project be developed, constructed, or acquired by a state public body until approved by a majority of those voting at a community election. The Supreme Court upheld the validity of the provision, as an appropriate exercise in "democratic decisionmaking."

Reliance on *Valtierra,* as authority in this case, is mis-

---

[3]This holding makes it unnecessary to reach appellant's further contention that a cumbersome zoning appeal process bears no rational relationship to a valid police power objective. In *Burt Realty Corp.* v. *Columbus* (1970), 21 Ohio St. 2d 265, we held that unnecessarily onerous administrative remedies need not be exhausted prior to seeking declaratory relief. A time-consuming and costly appellate process, designed solely to delay and discourage land-use changes, would present grave constitutional questions.

placed. *Valtierra* did not concern zoning, but rather the approval or disapproval of low-rent public housing. The court deemed such a decision to properly involve community-wide policy-making and compared the requirement to similar mandatory referendums for approval of state constitutional amendments, for the issuance of general obligation long-term bonds by local governments, and for certain municipal territorial annexation. At page 143, the court declared: "This procedure ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues."

It can scarcely be contended that every proposed land use change, no matter how small, in a city with a population of 20,000, either involves or allows community-wide policy-making. Rather, most involve hardships affecting individual parcels of property, which must be alleviated to preserve the constitutional validity of the ordinance.

Appellees also cite R. C. 303.11, 303.12, 519.11 and 519.12, which provide for county and township zoning. R. C. 303.11 provides that a comprehensive zoning resolution, adopted by the county commissioners, shall not become effective until approved by a majority of the voting public. R. C. 303.12 provides that amendments or supplements to such resolutions become effective 30 days after adoption, unless petitions are signed by a requisite number of resident voters, requesting that such change be placed on the ballot. R. C. 519.11 and 519.12 contain similar provisions with regard to township zoning.

Those statutes are of no help in deciding the present case. The imposition of zoning in a state's rural area is a matter of substantial significance, restricting severely the individual use of land, and determining, perhaps permanently, the direction of future development. As such, it clearly involves that type of policy decision justifying approval by those affected. Amendments to rural zoning ordinances, on the other hand, are not subject to mandatory voter approval, but rather to permissive referendum elec-

tions, when a substantial number of resident voters feel sufficiently aggrieved to circulate the appropriate petitions. Such provision contrasts sharply with the Eastlake charter, and thus is free from the deficiencies implicit in an unlawful delegation of legislative power.

We hold that the mandatory referendum provision of Section 3, Article VIII of the Eastlake charter constitutes an unlawful delegation of legislative power, thereby denying appellant due process of law. Whether the zoning of appellant's property for industrial use is reasonable, or whether the city of Eastlake has unlawfully attempted to exclude low and moderate income housing,[4] we do not decide. The judgment of the Court of Appeals, affirming the validity of the mandatory referendum and 55 percent approval provisions of the Eastlake charter, is reversed.

*Judgment reversed.*

O'NEILL, C. J., HERBERT, STERN and W. BROWN, JJ., concur.

CORRIGAN and CELEBREZZE, JJ., dissent.

STERN, J., concurring. In the instant case, the majority ably points out the basic legal deficiencies of the Eastlake charter provision. The broader issues raised by this action also, I believe, require comment.

Almost half a century ago, in the landmark case of *Euclid* v. *Ambler Realty Co.* (1926), 272 U. S. 365, the United States Supreme Court affirmed the validity of a community zoning ordinance which restricted the use of private land, and the court recognized that such restrictions were necessary to the welfare of complex urban com-

---

[4] An *amicus curiae* brief, filed by Lawyers for Housing, contends that Eastlake's mandatory referendum provision, and those of other cities, is designed to exclude low and moderate income housing entirely. Whether provisions so designed would be unreasonable and unlawful would depend upon the facts in each individual case. See *Belle Terre* v. *Boraas* (1974), 416 U. S. 1. The record herein justifies no finding, one way or the other, in this regard.

munities. As Mr. Justice Sutherland stated: "* * * Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even a half century ago, probably would have been rejected as arbitrary and oppressive." 272 U. S., at 387. In that case, the village of Euclid, by its zoning ordinance, restricted industrial development to nonresidential areas, and the court approved, stating: "If it be a proper exercise of the police power to relegate industrial establishments to localities separated from residential sections, it is not easy to find a sufficient reason for denying the power because the effect of its exercise is to divert an industrial flow from the course it would follow, to the injury of the residential public if left alone, to another course where such injury will be obviated. *It is not meant by this, however, to exclude the possibility of cases where the general public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way.*" (Emphasis added. ) 272 U. S., at 389, 390.

Present-day conditions raise new issues also requiring the weighing of the general public interest against the interests of a municipality.

There can be little doubt of the true purpose of Eastlake's charter provision—it is to obstruct change in land use, by rendering such change so burdensome as to be prohibitive. The charter provision was apparently adopted specifically, to prevent multi-family housing, and indeed was adopted while Forest City's application for rezoning to permit a multi-family housing project was pending before the City Panning Commission and City Council. The restrictive purpose of the provision is crudely apparent on its face. Any zoning change, regardless of how minor, and regardless of its approval by the Planning Commission and the City Council, must be approved by a city-wide referendum. The proposed change must receive, rather than a simple majority, at least a 55 percent affirmative vote. Finally, the owner of the property affected is required to pay the cost of the election, although the provision gives

no hint as to exactly which costs would be billed to a property owner.

There is no subtlety to this; it is simply an attempt to render change difficult and expensive under the guise of popular democracy.

Even stripped of its harsher provisions the charter provision poses serious problems. A mandatory, city-wide referendum which applies to any zoning change must, of necessity, submit decisions that affect one person's use of his property to thousands of voters with no interest whatever in that property. We need only imagine the adoption of this same provision in a city such as Cleveland. By such a provision, rezoning for a corner gasoline station would require the approval of hundreds of thousands of voters, most of them living miles away, and few of them with the slightest interest in the matter. This would be government by caprice, and would seriously dilute the right of private ownership of property. The law recognizes that the use a person makes of his property must inevitably affect his neighbors and, in some cases, the surrounding community. These real interests are entitled to be balanced against the rights of a property owner; but a law which requires a property owner, who proposes a wholly benign use of his property, to obtain the assent of thousands of persons with no such interest, goes beyond any reasonable public purpose.

Zoning provisions such as that in Eastlake's charter have a single motive, and that is to exclude, to build walls against the ills, poverty, racial strife, and the people themselves, of our urban areas. The struggles of our suburbs to build such walls can be seen in cases throughout the county. See, Note, Removing the Bar to Exclusionary Zoning to a Decent Home, 32 Ohio St. L. J. 373; *Concord Township Appeal* (1970), 439 Pa. 466, 268 A. 2d 765. Cf. *Matter of Golden* v. *Planning Bd. of Ramapo* (1972), 30 N. Y. 2d 359, 285 N. E. 2d 291. In the suburbs surrounding the city of Cleveland, the requirement of mandatory referendums for approval of zoning changes has been adopted by over a dozen communities; some of these communities have

provisions which specifically apply to any zoning change to permit multi-family or low-income housing. The inevitable effect of such provisions is to perpetuate the de facto divisions in our society between black and white, rich and poor. As one commission report has pointed out: "The people of the slums are the symptoms of the urban problem, not the cause. They are virtually imprisoned in slums by the white suburban noose around the inner city, a noose that says 'Negroes and poor people not wanted.'" National Commission on Urban Problems, Building the American City, 1 (1968). The exercise of the police power through zoning cannot be permitted where its sole purpose is to tighten that noose.

Zoning, and other forms of urban planning, are even more fundamental and necessary today than they were nearly fifty years ago when *Euclid* v. *Ambler Realty Co.* was decided, for our cities are far more populous and our problems far more complex. Certainly there is no simple solution to the problem of planning a community's development so that it be healthy, well-balanced, and just. "* * * [Z]oning is a complex and important function of the state. It may indeed be the most essential function performed by local government, for it is one of the primary means by which we protect that sometimes difficult to define concept of quality of life." *Belle Terre* v. *Boraas* (1974), 416 U. S. 1, 13 (Marshall, J., dissenting).

The importance of zoning makes imperative the prevention of its abuse or of its application to systematically perpetuate inequity.

I can perceive no proper public purpose which would justify the burdensome nature of the Eastlake charter provision, or would suggest that it represents planning for the community's needs rather than simple resistance to change and exclusion of persons of low and middle income. Accordingly, I agree with the majority that the charter provision involved herein is invalid, and concur in the opinion and judgment.

O'NEILL, C. J., HERBERT and W. BROWN, JJ., concur in the foregoing concurring opinion.

CORRIGAN, J., dissenting. This appeal brings into question the validity of the provision of Section 3, Article VIII of the Charter of the city of Eastlake, which provides that zoning ordinances shall not be effective until "approved by a 55% favorable vote of all votes cast of the qualified electors * * * at the next regular municipal election."

It is appellant's position that this charter provision "is invalid as contrary to the Constitutions of the United States and the state of Ohio because it deprives a property owner of his property without due process of law" and that it "is invalid as contrary to the referendum provisions of the Ohio Constitution."

Appellant argues that due process of law entitles it "to have its use of its real property controlled by a responsible legislative organ of government, and not to the uncontrolled whim of a *minority* of its neighbors." *Eubank* v. *Richmond* (1912), 226 U. S. 137, is cited by appellant. In that case, the city ordinance provided for the establishment of building lines by the committee on streets upon written request by the owners of two-thirds of the property abutting a street. The court found the ordinance to be "an unreasonable exercise of the police power," stating, at pages 143-144: "The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the proper rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest or even capriciously. * * *"

Appellant notes that *Eubank* was distinguished in *Thomas Cusack Co.* v. *Chicago* (1917), 242 U. S. 526. There, an ordinance permitted erection of billboards upon the consent of the owners of a majority of the frontage of the property on both sides of the street in the block where the billboard was to be erected. It was argued that this constituted "* * * a delegation of legislative power to the owners of a majority of the frontage of the property in the block 'to subject the use to be made of their property by

the minority owners of property in such block to the whims and caprices of their neighbors.' "

In upholding the validity of the ordinance, the court said, at page 531:

"The plaintiff in error relies chiefly upon *Eubank* v. *Richmond*, 226 U. S. 137. A sufficient distinction between the ordinance there considered and the one at bar is plain. The former left the establishment of the building line untouched until the lot owners should act and then made the street committee the mere automatic register of that action and gave to it the effect of law. The ordinance in the case at bar absolutely prohibits the erection of any billboards in the blocks designated, but permits this prohibition to be modified with the consent of the persons who are to be most affected by such modification. The one ordinance permits two-thirds of the lot owners to impose restrictions upon the other property in the block, while the other permits one-half of the lot owners to remove a restriction from the other property owners. This is not a delegation of legislative power, but is, as we have seen, a familiar provision affecting the enforcement of laws and ordinances."

*Cusack* was commented upon in *Valkanet* v. *Chicago* (1958), 13 Ill. 2d 268, 272, 148 N. E. 2d 767, wherein the court said:

"While the *Cusack* decision has been criticized (University of Illinois 1954 Law Forum, 309, 311-312), it has been generally followed. And, even though it is impossible to lay down a hard-and-fast rule, we conclude that if an ordinance permits a certain percentage of the property owners to impose or create a restriction upon their neighbors' property by the devise of consent provisions, such limitation constitutes an invalid delegation of legislative power, but if the consent provision merely waives or modifies a lawful and reasonable legislative restriction or prohibition, it is within constitutional limitations. * * *"

On the issue raised in the above-cited cases, this court, in paragraph three of the syllabus of *State, ex rel. Standard Oil Co.,* v. *Combs* (1935), 129 Ohio St. 251, held;

"An ordinance requiring written consents of fifty-one per cent of the property owners in a residential district within a radius of six hundred feet from a filling station, as a prerequisite to its installation, is not a delegation of legislative power conferred by council upon such property owners; and such consent provisions are not repugnant to our state or federal constitutions. (*Cincinnati, W. & Z. Rd. Co.* v. *Commrs. of Clinton County*, 1 Ohio St. 77, approved and followed; *City of Canton* v. *Mid-Continent Producers & Refiners Corp.*, 115 Ohio St. 705, overruled.)"

The foregoing decisions are distinguishable from the instant case. Here, we are concerned with a referendum on a zoning ordinance which is submitted to the electorate of the municipality.

Facts similar to those appearing in this cause were before the court in *Southern Alameda Spanish Speaking Organization* v. *Union City* (C. A. 9, 1970), 424 F. 2d 291. There, a city-wide referendum nullifying a zoning ordinance rezoning certain land was upheld. As to a contention that the "referendum zoning" violated due-process requirements, the court said, at page 294:

"Appellants initially challenge the constitutionality of California's referendum procedures as applied to the zoning process. They contend that 'referendum zoning' violates due process requirements.

"The rights asserted are those of a landowner (SASSO) to be free from arbitrary restrictions on land use. Appellants assert that regulation of land use by zoning is constitutionally permissible only where procedural safeguards assure that the resulting limitations have been determined, by legislatively promulgated standards, to be in the interest of public health, safety, morals, or the general welfare. They contend that the referendum process destroys the necessary procedural safeguards upon which a municipality's power to zone is based and subjects zoning decisions to the bias, caprice and self-interest of the voter. They rely on *Washington, ex rel. Seattle Title Trust Co.*, v. *Roberge*, 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210

(1928), and *Eubank* v. *City of Richmond,* 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156 (1912).

"Appellants' reliance on these cases is misplaced. There, local ordinances permitted residents of a neighborhood, by majority vote (*Eubank*) or by withholding consent (*Washington*), to impose restrictions that otherwise had not legislatively been determined to be in the public interest. The resulting rule, as applied to appellants' contentions respecting procedural safeguards, would seem to be that an expression of neighborhood preference for restraints, uncontrolled by any legislative responsibility to apply acceptable public interest standards, is not such a determination of what is in the public interest as will justify an exercise of the police power to zone.

"A referendum, however, is far more than an expression of ambiguously founded neighborhood preference. It is the city itself legislating through its voters—an exercise by the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest. See *Spaulding* v. *Blair,* 403 F. 2d 862 (4th Cir. 1968). This question lay at the heart of the proposition put to the voters. That some voters individually may have failed to meet their responsibilities as legislators to vote wisely and unselfishly cannot alter the result.

"Nor can it be said that the resulting legislation on its face was so unrelated to acceptable public interest standards as to constitute an arbitrary or unreasonable exercise of the police power. See *Washington, ex rel. Seattle Title Trust Co.,* v. *Roberge, supra; Eubank* v. *Richmond, supra; Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 395, 47 S. Ct. 114, 71 L. Ed. 303 (1926). Many environmental and social values are involved in a determination of how land would best be used in the public interest. The choice of the voters of Union City is not lacking in support in this regard.

"Thus in the present case neither the zoning process itself nor the result can be said to be such an arbitrary

or unreasonable exercise of the zoning power as to be violative of appellants' right to due process of law. * * *"

In my opinion, the foregoing reasoning is persuasive and I would hold that the submission of a zoning ordinance to the electorate of a municipality is not violative of due process.

Examination of the statutes reveals that submission of zoning resolutions to electors by referendum is not an innovative concept. R. C. 303.11 provides for submission of zoning resolutions adopted by a board of county commissioners to the "electors residing in the unincorporated area of the county included in the proposed plan of zoning for their approval or rejection. * * *"

R. C. 519.11 provides for submission of zoning resolutions adopted by a board of township trustees "to the electors residing in the unincorporated area of the township included in the proposed plan of zoning for their approval or rejection * * *."

In each statute the zoning regulations become effective only if a majority of the vote cast on this issue is in favor of the proposed plan.

R. C. 303.12 and 519.12 provide for referendum votes on amendments or supplements to county or township zoning resolutions respectively.

R. C. 519.12 was brought into question in *Cook-Johnson Realty Co.* v. *Bertolini* (1968), 15 Ohio St. 2d 195. As to the constitutionality of that section, it was said, at pages 200-201:

"What the General Assembly has done in Section 519.-12, Revised Code, is to provide the people of the several townships with a power to veto, by use of the device of referendum, zoning resolutions passed by township trustees.

"We find no constitutional impediment to a grant of legislative power by the General Assembly to township trustees to make zoning resolutions, nor for the General Assembly to reserve the power of referendum to the people who will be affected by such resolutions. Therefore, Section 519.12, Revised Code, insofar as it accomplishes these purposes of the General Assembly, is constitutional."

In *State, ex rel. Bramblette,* v. *Yordy* (1970), 24 Ohio St. 2d 147, this court noted, at page 150:

"In providing for referendum, however, a municipal charter is not restricted to the adoption of the same provisions enacted by the General Assembly. It may be less restrictive as to use of the referendum, as was the Charter of the city of Toledo which authorized referendum on all ordinances, including one levying a tax passed as an emergency measure. *State, ex rel. Snyder,* v. *Bd. of Elections* (1946), 78 Ohio App. 194. It may be more restrictive, as in *Dillon* v. *Cleveland, supra* (117 Ohio St. 258), where a referendum would have been required under state law, but was not required under the provisions of the Charter of the city of Cleveland."

When the above-stated principles from *Cook-Johnson Realty Co.* and *Bramblette, supra,* are applied to the instant cause, it is clear that the referendum provisions of the city charter in question are not "invalid as contrary to the referendum provisions of the Ohio Constitution."

The fact that the charter section in question requires "a 55% favorable vote of all votes cast" does not, in my opinion, stand as an impediment to the constitutional validity of the referendum procedure established by the charter. Similar restrictive election requirements can be found in the statutes, *e. g.,* R. C. 139.02 (for issuance of federal aid bonds); R. C. 133.16 (for issuance of bonds for reconstruction of bridges); R. C. 1515.04 (creation of soil and water conservation district); and R. C. 5705.191 (approval of excess tax levy).

To particularize, I would hold in this case that the mandatory referendum provision of Section 3, Article VIII of the Eastlake charter, does not constitute an unlawful delegation of legislative power and does not deny to the appellant its constitutional right to due process of law. Accordingly, I would affirm the judgment of the Court of Appeals

CELEBREZZE, J., concurs in the foregoing dissenting opinion.