HYDRAULIC PRESS BRICK COMPANY, APPELLANT, *v.* COUNCIL OF CITY OF INDEPENDENCE ET AL., APPELLEE.

(No. 47256—Decided April 2, 1984.)

*Mr. James C. Sennett, Mr. Raymond J. Durn* and *Mr. Thomas J. Sidman,* for appellant.

*Mr. Stephen M. O'Bryan,* for appellee.

MARKUS, J. A landowner applied to the city's planning commission for permission to drill a gas well on its property. After extended proceedings, the planning commission approved that request pursuant to authority created by the city's zoning code. The city council then reviewed the planning commission's decision and decided to deny the

landowner's request without specifying its reasons.

The landowner appealed that action as an administrative decision to the common pleas court, which affirmed the council's action. On landowner's appeal from the adverse common pleas court judgment, we conclude that the city council's action was not supported by sufficient evidence. Therefore, we reverse and direct that the city permit landowner's requested use subject to reasonable conditions.

## I

The administrative record supplied by the city to support its council's ruling contains no evidence beyond the data gathered by the planning commission. The record includes: (a) minutes of the planning commission meetings, (b) minutes and a partial transcript of the council meetings, (c) maps and photographs, (d) a seismologist's report and safety recommendations, (e) correspondence, and (f) two gas well drilling permits which the state issued to the landowner for this property. Collectively that data provides the history for this controversy.

The landowner holds a plat containing approximately seventy-five acres which the city has zoned "U-6" for commercial or industrial use. The ordinance governing class "U-6" uses provides:

"1141.07 CLASS U-6 USES. (Commercial or industrial)

"(a) Bakeries, bottling works, ice and ice cream manufacturers and cold storage plants.

"(b) Warehouses for storage of household goods and building materials and equipment.

"(c) Coal, ice and wood sales.

"(d) Laundry, carpet cleaning, dry cleaning and dyeing.

"(e) Repair shop for motor vehicles.

"(f) Wholesale produce market and salesroom.

"(g) Storage of refined petroleum products.

"(h) *Any other commercial, manufacturing or industrial building or use which shall not be injurious to the adjacent premises or occupants thereof; which shall not constitute or threaten to become a public nuisance by reason of noise, smoke, vibration, odor, possibility of explosions, glaring lights, radio or television interference, pollution of ground or surface waters, accumulation of obnoxious or undesirable wastes of inherent nature; which shall not tend to create safety or traffic hazards, which may be approved by the Planning Commission and Council; and which shall not be forbidden or prohibited by any provision of this Zoning Code or any other ordinance of the Municipality.*

"(i) Accessory uses customarily incident to an authorized use." (Emphasis added.)

Pursuant to its 1969 agreement with the city, the landowner has been manufacturing construction materials on that property, using shale that it mines there. Shale mining requires blasting and excavation. The landowner's manufacturing process uses substantial quantities of natural gas which landowner previously purchased from the local gas utility. In an effort to reduce its costs, the landowner sought to develop its own gas source on its own land.

The U-6 zoning classification does not specifically list a gas well as a permitted use, but no zoning ordinance prohibits that use. The city may permit that use of property zoned U-6 under the criteria provided by ordinance 1141.07 (h), *supra*. The procedure for considering such requests is set forth in ordinance 1141.09:

"1141.09 HEARINGS BY PLANNING COMMISSION: COUNCIL.

"Where approval of the Planning Commission or council is required by this section for the location of a designated or undesignated use or struc-

ture within any use district, an application for such approval shall first be submitted to the Planning Commission.

"After public notice and hearing, the Planning Commission shall determine whether such use or structure shall be approved. In making such determination, findings of fact shall be made and entered in the minutes of the Commission as to the effect of such use or structure on neighboring property, the possible creation of public nuisances by reason of noise, smoke, wastes, odor, vibrations, lights, stream or ground pollution, traffic and safety hazards or otherwise, and as to the effect of such proposed use or structure on the public peace, health, safety, morals and welfare.

"If Council's approval is also required for such use or structure, the determination and findings of fact of the Planning Commission shall be submitted to and reviewed by Council, which may also make such investigations, require such supporting data and make such findings as it may deem necessary. Council may thereupon affirm or deny the application and shall enter its determination in its minutes."

The planning commission gave public notice and scheduled public hearings on this landowner's request to drill a gas well on its property. The landowner presented oral and documentary evidence to support its application. A topographical map showed the site of the proposed well. The location more than satisfied state minimum requirements that the well be at least three hundred feet from the lot boundaries and one hundred fifty feet from buildings. The landowner originally proposed construction of two gas wells but voluntarily amended its proposal to eliminate one of them. The landowner's contractor had obtained a state gas well drilling permit for the proposed well.

Total drilling time would involve forty-five hours over a five-day period.

Noise from the drilling would be similar to the sound of two diesel trucks at the well site. The proposed drilling would occur four hundred feet from the nearest road. The contractor would bring approximately eight truckloads of equipment onto the property and later remove it. He would also require one truckload of water per hour during actual drilling. A state oil and gas well inspector would supervise the drilling.

When the well became operable, it would produce brine and oil as reportedly non-hazardous waste products. The landowner would temporarily store those products in tanks on its property. It would truck the brine to another county for disposal once each week. The landowner would truck the minimal oil residue for disposal several times a year. However, it would store none of the gas produced, since it would pipe all gas production directly to its manufacturing activity for prompt consumption.

The well and pipelines would conform with state regulations and the local gas utility's specifications. Photographs and drawings depicted the assembled well structure which would not be visible off the property, because the landowner would fence and screen it. The only neighboring property owner who could see the well area expressly agreed to the proposed well.

When commission members expressed concern about the compatibility of the proposed gas well with the landlord's mining operations, the landowner obtained a seismologist's report. That expert concluded that blasting involved in the landowner's mining activity could be safely done as near as twenty feet from the well. The landowner's existing mines are approximately one thousand feet from the proposed well, and the landowner did not expect to mine closer to the proposed well. Further, the landowner agreed to conform with the seismologist's standard and

other applicable safety requirements for any future mining locations.

The city council met three times to consider the planning commission's recommendation to approve the landowner's request. At the second meeting, one councilman argued that the landowner's proposed gas well conflicted with objectives advanced in the city's "master plan":

"And for the record, I'd just like to read a couple of passages in our Master Plan, which casts a slight shadow on this whole project. * * *

"Let me read from the manual that was passed not too long ago, the Master Plan.

" 'The U-6 Industrial And Commercial Zoning Committee prohibits the development of heavy industry within the City. *In accordance with the objectives of the City and the policy regarding industrial development, the U-6 district should be modified or eliminated in favor of light manufacturing, office, research or wholesale distribution uses that are more compatible with the residential character of the community and will safeguard the quality and environment for the residents of Independence.* In addition, the majority of land in the eastern part of the City is adjacent to the National Recreation Area and is *presently zoned for industrial and commercial use, which is an adjacent use that is detrimental to the intent and purpose of the recreation area.*

" 'Recently lands that were being threatened with such types of developments were included within the boundary of the National Recreation Area by ·Congress to insure the future protection of its periphery and immediate boundary. Such a precedent indicates that lands similarly threatened in the future may also be expected to be removed from the City and placed under federal ownership. *The City should discourage further expansion of industrial and other detrimental activities along the environmentally sensitive recreation area boundary.'*

"* * *

"To read further, 'Aside from the above specific recommendation, future industrial type development should continue in designated areas where lands are still available. A limited amount of development will be able to be located along the Pleasant Valley area and old Rockside area, but the outer belt north appears to be approaching maximum level of development. *Future development at the Hemlock and Stone Road area and other lands in that vicinity currently zoned for industrial development should be discouraged due to the unsuitable soil, slope conditions and the close proximity to the Cuyahoga Valley National Recreation Area."* (Emphasis added.)

At their third meeting on this subject, another councilman referred to a gas well leak forty miles away and suggested further investigation of potential problems. A colleague responded:

"I think we should go ahead with this thing, because I think that whatever they want to do, they can do. Whatever we want to do, we can do. I recommend that we proceed with this thing and get it over."

The council then voted to deny the landowner permission to drill a gas well on its property. As a group, the council gave no reason for its action beyond the individual arguments described earlier. Council's minutes show that one councilman voted to deny the application because he believed that the landowner's proposed use conflicted with the master plan.

The landowner appealed to the common pleas court pursuant to statutory provisions for the review of an administrative decision. R.C. 2506.01 et seq. The trial court took no new evidence and confined its review to the administrative record. It "dismissed" the landowner's appeal with a finding

that the council's decision was "reasonable and based on substantial evidence."

## II

The landowner's sole assignment of error contends:

"The court of common pleas erred in affirming as reasonable and supported by substantial evidence the decision of council because the legally required preponderance of substantial, reliable and probative evidence on the whole record does not exist to support council's decision, the reliance by council on the single stated basis for its decision, *i.e.,* the alleged inconsistency of the proposed gas well with the city's master plan, was unreasonable, arbitrary and capricious, and therefore the decision of the council cannot be sustained as a matter of law."

The U-6 classification described by the city's zoning code allows "any other commercial, manufacturing or industrial building or use" which does not contravene specified standards. Therefore, the city council's quasi-judicial function was purely administrative in determining whether this landowner's proposed use violated those specific standards. The landowner's request sought a "special permit" for a generally authorized use. Cf. *Nunamaker* v. *Bd. of Zoning Appeals* (1982), 2 Ohio St. 3d 115, 118; *Donnelly* v. *Fairview Park* (1968), 13 Ohio St. 2d 1, 3 [42 O.O.2d 1].

The landowner did not seek a variance to authorize an otherwise prohibited use because of special hardship. See *Nunamaker* v. *Bd. of Zoning Appeals, supra; Boston* v. *Montville Township Zoning Bd. of Appeals* (1972), 32 Ohio Misc. 118, 120-121 [61 O.O.2d 184]; *Forest City Enterprises* v. *Eastlake* (1975), 41 Ohio St. 2d 187, 190 [70 O.O.2d 384].

Substantial evidence in the administrative record supports a finding that the proposed gas well satisfied the conditions for a special permit under ordinance 1141.07(h). No evidence tends to show that the proposed use contravenes those standards. "Legal matters are determined by facts, not by beliefs or desires." See *Libis* v. *Bd. of Zoning Appeals* (1972), 33 Ohio App. 2d 94, 100 [62 O.O.2d 146]. Thus, we must reverse the common pleas judgment. Cf. *Dudukovich* v. *Housing Authority* (1979), 58 Ohio St. 2d 202, 207 [12 O.O.3d 198]; *Cincinnati Bell* v. *Glendale* (1975), 42 Ohio St. 2d 368, 370 [71 O.O.2d 331].

The city's law director argued this case on appeal. He acknowledged that his sole challenge to the requested use was its alleged conflict with the city's "master plan." The city could properly consider whether a requested *variance* was consistent with such a general plan, particularly since it was enacted as a city ordinance. Cf. *C. Miller Chevrolet* v. *Willoughby Hills* (1974), 38 Ohio St. 2d 298 [67 O.O.2d 358].

The city should not consider general aspirations in deciding whether a specific use contravened legislatively adopted standards for a generally permitted use. *Phillips Petroleum Co.* v. *Zoning Board of Appeals* (Me. 1970), 260 A.2d 434. The quoted argument by a councilman (*supra,* in Part I) expresses dissatisfaction with existing zoning ordinances for that area. Unless the city rezones that area, it must authorize uses consistent with its existing zoning code. Council's denial of a special permit because it prefers that the land not be used as it is zoned constitutes unlawful rezoning without legislative action. *Schomaeker* v. *First Natl. Bank* (1981), 66 Ohio St. 2d 304, 309 [20 O.O.3d 285] (same rule for limitation on administratively approved variance).

In this case, the city council did not purport to amend or revise existing zoning provisions. As a matter of law, its refusal to approve the requested special permit was "unsupported by the pre-

ponderance of substantial, reliable and probative evidence." R.C. 2506.04. Its action was "illegal, arbitrary, capricious, [and] unreasonable," in light of its authorized role in this controversy. *Id.*

The city's planning commission and its council did have authority to impose reasonable conditions on the special permit to ensure continued compliance with the standards in ordinance 1141.07(h). The planning commission obtained such assurances from the landowner, and the council could properly condition the special permit on their performance.

The landowner's assigned error has merit. We reverse the trial court's judgment and make the order it "should have rendered." See App. R. 12(B). We remand this case to the Independence City Council with instructions to grant the landowner's request for a special permit for the proposed gas well. The council may impose the assurances which the landowner provided to the planning commission as conditions for that special permit.

*Judgment reversed and
cause remanded.*

PARRINO, P.J., and ANN MCMAN-AMON, J., concur.