**CITIZENS COMMITTEE FOR FARADAY WOOD et al., Plaintiffs,**

v.

**John V. LINDSAY, Mayor of the City of New York, et al., Defendants.**

No. 71 Civ. 2297.

United States District Court, S. D. New York.

Aug. 20, 1973.

Richard F. Bellman, Lewis M. Steel, New York City, for plaintiffs.

Norman Redlich, Corp. Counsel, New York City, for defendants; James Nespole, New York City, Leonard Bernikow, Kew Gardens, N. Y., Judah Dick, Frances Loren, New York City, of counsel.

ROBERT J. WARD, District Judge.

This is an action seeking declaratory and injunctive relief and damages against the City of New York; its Mayor, John V. Lindsay; the Housing and Development Administration of the City of New York, an agency of the City ("HDA"); and Albert B. Walsh, the Administrator of that agency. The plaintiffs allege that these defendants refused to process an application for financing the construction of a housing project known as Faraday Wood under the City's Mitchell-Lama program, Article 2 of the New York Private Housing Finance Law (McKinney's Consol.Laws, c. 44B, Supp.1972), because of racial discrimination in violation of the Fourteenth Amendment to the Constitution of the United States; the Civil Rights Acts, 42 U.S.C. §§ 1981, 1982, 1983 and 1985; and the Fair Housing Law, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq.

The plaintiffs are a civic group which supports the project, the sponsor of the project, 8 low-income minority residents of New York City, and a resident of the Riverdale section of the Bronx, where the project was proposed to be built, who supports the project. Plaintiffs seek to bring this action as a class action.

■ This Court previously determined that it had jurisdiction of the claims of the sponsor, The Association for Middle Income Housing, Inc. ("AMIH"), under 28 U.S.C. § 1331 and that it had jurisdiction of the claims of the other plaintiffs under 28 U.S.C. § 1343. Memorandum Decision of July 22, 1971. This decision must be modified in light of City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Under the holding of that case, the Court has jurisdiction under 28 U. S.C. § 1343 only of the claims against the individual defendants, John V. Lindsay and Albert B. Walsh. Nevertheless, the Court concludes that it has jurisdiction of the action on behalf of all plaintiffs against all defendants including the City and HDA under the Fair Housing Law, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. and that claims asserted pursuant thereto are not time-barred. Kennedy Park Homes Ass'n v. City of Lackawanna, 318 F.Supp. 669 (W.D.N.Y.), aff'd, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U. S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); *see also*, Sisters of Providence of St. Mary of the Woods v. City of Evanston, 335 F.Supp. 396 (N.D.Ill.1971).

This action is permitted to proceed as a class action on behalf of all residents of the City of New York residing in inadequate and deteriorating housing units who would qualify for residence in low-income housing units as provided for within the terms of Sections 11, 11-a and 31 of the New York Private Housing Finance Law (McKinney Supp. 1972).

In this case, it is necessary for the Court to determine why the project known as Faraday Wood faltered and ultimately died. To do this the Court has been required to ascertain the motivations of the defendants which led to the ultimate demise of this project. Questions of motive are necessarily difficult to determine. Where, as here, the motive alleged is racial discrimination, which generally is exhibited—if at all—in cloaked and subtle forms, the task is all the harder. *See,* Palmer v. Thompson, 403 U.S. 217, 225, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971). The job has been made more difficult still because the Court did not have the opportunity to observe any witnesses.[1] Nevertheless, the Court, upon the record made at trial, has determined that sufficient evidence has not been presented to prove that the defendants purposefully engaged in racial discrimination or that their actions resulted in a constitutionally invalid discriminatory effect.

On March 16, 1966, the Mayor announced the so-called scatter-site program for the selection of sites for new public housing. Under the guidelines announced, new construction was to be "concentrated on vacant land and in under-utilized areas in outlying sections of New York City." One of the purposes of this program was to "open housing opportunities in sound, predominantly white, middle-income neighborhoods for those now confined to the City's ghettos." The site known as Faraday Wood, which is located in the area of the City known as North Riverdale, was not among those which the Mayor initially asked the City Planning Commission ("CPC") to consider for the scatter-site program. On July 11, 1967, the New York City Housing Authority submitted a plan for a public housing project on the Faraday Wood site to the CPC and apparently to the Board of Estimate. The proposal called for a federally-aided low-rent public housing project to be developed on a portion of the site and a city-aided or federally-aided moderate income project to be developed on the remainder of the site. The proposed low-rent public housing was to consist of one 15-story, 150 dwelling unit building to house 65% families and 35% elderly. The middle-income portion was also to contain 150 units. It was also proposed that the entire project be developed by the sponsor of the middle-income housing with the Housing Authority leasing or purchasing 150 units for low-income tenants.

On July 28, 1967, AMIH submitted an "Applicant's Certificate of Interest" to become the sponsor of the proposed project and a Preliminary Site Information form, to the Housing and Development Board, predecessor agency to the HDA, in response to discussions with members of the CPC requesting AMIH to undertake this project. AMIH's proposal called for a 465 dwelling unit project to be built on 8.6 acres.

In August and September, 1967, the CPC held two open hearings on the proposed scatter-site program including designation of the Faraday Wood parcel as one of the sites. After these hearings, Faraday Wood was designated for development of a Mitchell-Lama project; the proposal for one-half of the project to be leased or sold to the Housing Authority for low-income units was eliminated following these hearings. In line with the City's policy regarding middle-income projects, twenty percent of the units were to be reserved for low-income tenants. Following its filing of the application and site approval form, AMIH developed a concept—or general idea as to the nature—of the project. This concept was submitted to the local Community Planning Board which recommended to the CPC that the site was appropriate for a middle-income project with a small percentage of low-income

---

1. This action was tried before the late Judge Edward C. McLean. After reassignment to me following Judge McLean's death, the parties entered into a stipulation that I should decide the case upon the record previously made.

units provided that remedial action would be taken to solve the problems of overcrowded schools and inadequate transportation, parking, police and fire protection, and recreational facilities. On May 14, 1968, the Chairman of the CPC, Donald H. Elliott, wrote Jason R. Nathan, the then Administrator of HDA, that the CPC had agreed to consider a formal application for a Mitchell-Lama project on the Faraday Wood site. On May 27, 1968, HDA advised AMIH that it had given preliminary site approval for a Mitchell-Lama development subject to submission of acceptable building plans, proof of economic feasibility and availability of City funds. AMIH entered into a Sponsor's Agreement with HDA on July 10, 1968, and HDA approved AMIH as the project sponsor for a Mitchell-Lama development at Faraday Wood.

On April 3, 1969, AMIH's architect, the firm of Richard Kaplan, submitted a set of preliminary drawings to HDA showing the proposed buildings in greater detail. HDA reviewed these drawings and met with AMIH's architects to discuss the design as it was being revised. AMIH's architects submitted a second series of drawings to HDA in late July or early August, 1969. These designs were for an "all-family" project, but ten percent of the units were intended for the elderly. The plans called for several low rise buildings of up to six stories and one twenty-story tower containing a total of under 400 dwelling units, a reduction from their original proposal. Until this time, the processing of AMIH's application was in accord with usual procedures. AMIH and the other plaintiffs do not charge any irregularities or failure to process the application for the Faraday Wood development before August 4, 1969.

The evidence indicates that processing of AMIH's application by HDA came to a virtual halt soon after submission of this second set of drawings. No discussion about this second set of drawings occurred between HDA and AMIH's architects as was the customary practice.

No action was again taken by HDA on the Faraday Wood project until about January, 1970. The events which occurred during this hiatus strongly indicate that part of the reason for its occurrence was a political response to community opposition to the project by some officials of the City Administration during the heat of an election campaign. On August 8, 1969, the City Hall Press Office issued a press release in which Mayor Lindsay was quoted as stating that he was opposed to the Faraday Wood project on the grounds that the site was unsuitable for high-rise construction and that the community was concerned about overcrowding in the schools. This release written by Robert Rosenberg, an Assistant Administrator of HDA who was also Chairman of the Mayor's Urban Action Task Force for the Northwest Bronx, was issued without the Mayor's authorization or knowledge. It does, however, reveal that his administration would thereafter oppose the project in response to opposition in the community. While it is clear that HDA, as part of the Lindsay administration, was also reacting to the sentiments of the community, there is evidence that it was also—albeit to a lesser degree—concerned about problems inherent in the nature of the proposed design. Furthermore, a political response to community opposition is not automatically evidence of racial discrimination by public officials in response to racially based opposition in the community. On the record in this case, the plaintiffs have not established that racial motives underlay the community opposition to this project; therefore, to the extent that the inaction of HDA was a response to community concerns, no racially discriminatory motives can be imputed to it. That there was some racial opposition does not mean that opposition on other grounds was not the overriding community sentiment or the nature of the opposition to which the administration responded.

The community involved was concerned with rapid population growth and

subsequent overtaxing of community facilities. The community was also concerned about the expanding number of high-rise apartment buildings, which they viewed as detracting from their environment. When given the opportunity, the community gave general expression to these concerns. *See* New York City Planning Commission, *Plan for New York City 1969—A Proposal, Vol. 2 The Bronx,* 146–47; Manousoff Associates for New York City Planning Commission, *New York City Master Plan—Riverdale Study Phase I.* The Manousoff report was published early in 1968 and was based on a study undertaken from June 1 to September 15, 1967. Concurrently with the developments involving Faraday Wood, the community was seeking a rezoning of the entire North Riverdale area to eliminate all future high-density development. It appears to the Court that the inference may well be drawn that the community made the Faraday Wood project the focus of opposition to further high-density development because the public hearings required by this publicly-aided project gave them an opportunity to voice their opposition—an opportunity which was absent where privately-funded projects not requiring zoning variances were involved. This conclusion is buttressed in the Court's view by evidence that in the 80% of middle-income apartments which were not to be reserved for low-income residents, rents might conceivably have been as much as $80 per room per month. Under the formula governing income eligibility for Mitchell-Lama housing, it is clear that people who by no stretch of the imagination could be classified as low-income would be eligible for 70–80% of the apartments.[2]

Beginning in November, 1969, in response to a letter from plaintiff Ann Montero supporting the reactivation of the Faraday Wood project, discussion took place within the administration regarding such reactivation. Mr. Rosenberg opposed reviving the project on the grounds that the Mayor had given his commitment in opposition to the project and could not reverse his position and that there was still community opposition.

The reactivation of the Faraday Wood project in modified form was undertaken following defendant Albert Walsh's becoming Administrator of HDA in January, 1970. In February, 1970, Walsh met with the president of AMIH and suggested that the project be changed from all-family to 50 percent family and 50 percent elderly housing. Although other factors were again involved in this recommendation, the predominant reason for Walsh's suggesting this change was to make the project more acceptable to the community. But again it is necessary to state that there is no clear evidence in the record before the Court to link this admitted community opposition to racism. There is equally compelling evidence that the fewer children and reduced automobile use in a project which was 50 percent elderly would respond to and somewhat alleviate the concerns voiced by the community.

AMIH agreed to this change to a 50 percent family and 50 percent elderly project and proceeded to modify the design it had originally submitted in order to reflect the requirements this change necessitated. The evidence establishes that this revised proposal was not processed according to HDA's usual procedures. Part of the reason for the unique treatment in the processing of this revised proposal was that it was a revision rather than an initial application. But undoubtedly another consideration behind this special handling was the political overtones attached to the project because of the hostility in the Riverdale community.

The 50–50 proposal came to naught. The demise of this proposal appears to have been caused in part by a reluctance within HDA to proceed with such a politically volatile project and in part by

2. N.Y. Private Housing Finance Law § 31(2) (McKinney Supp.1972).

genuine differences of opinion between HDA and AMIH on design, cost, and financing. Given the usual nature of processing an application by a Mitchell-Lama sponsor through HDA, it appears to the Court that the technical problems which existed could have been resolved through the collaborative efforts of AMIH and HDA had both sides not adopted rigid positions. Although previously advised orally at a meeting in November, 1970, that HDA would not process the proposal then before it, AMIH received formal notification that HDA was terminating the Faraday Wood project in a letter from HDA Deputy Commissioner Edward Levy in late December, 1970. In spite of some attempts to negotiate the differences, this action was effectively the end of the Faraday Wood project.

The Court finds that the underlying reason for the difficulties encountered by AMIH in its dealings with HDA was the community opposition to the project. The cost, technical and design problems asserted by HDA as the primary basis for its objections to the all-family proposal simply are not persuasive except in the context of community concern. Furthermore, until its refusal to do additional work on the 50–50 project without a firm commitment from HDA, AMIH and its architects consistently attempted to resolve the technical, design, and cost problems perceived and called to AMIH's attention by HDA. For example, AMIH's design provided for one indoor parking space for each apartment; space for classrooms was to be allotted if necessary; and the facing of the building was changed from concrete to brick to meet HDA's objection to the cost of the former. There is no evidence that AMIH's architects would not have continued to modify their design in order to adapt it to meet HDA objections. This is not to say that these factors were non-existent and simply woven out of whole cloth in the face of litigation. Nevertheless, they were clearly of secondary importance and readily soluble if HDA had not simply pushed the project aside.

■ Having found that HDA's failure to process the Faraday Wood project was primarily, if not totally, in response to community opposition; that this opposition was not shown to be rooted in racial discrimination to any significant extent; and that to the extent there was racial opposition in the community, HDA was not acting in response thereto; it is clear that there has been no showing that any of the defendants has engaged in purposeful racial discrimination in violation of the Equal Protection clause of the Fourteenth Amendment or of any statute.

■ In the absence of a finding of purposeful discrimination, it is necessary to determine if the conduct of any of the defendants had a racially discriminatory effect violative of the Constitution or any statute. The Court concludes that there was not such an effect.

■ Not every state action which has some adverse effect on minority persons is unconstitutional or in violation of a statute. For example, it must be shown that the effect of the action under challenge falls more heavily on minority group members than on the population as a whole. Or it must be shown that the discriminatory effect results from a prior pattern or practice of discrimination. Furthermore, in many housing cases which find an impermissible discriminatory effect, a finding of purposeful discrimination could have been and, in some cases, was made. *See, e. g.,* Kennedy Park Homes Ass'n v. City of Lackawanna, N. Y., 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). The Court recognizes that the statement by the Second Circuit in the *Lackawanna* case, *supra,* that

"[e]ven were we to accept the City's allegation that any discrimination here resulted from thoughtlessness rather than a purposeful scheme, the City may not escape responsibility for placing its black citizens under a severe disadvantage which it cannot justify. *Norwalk CORE, supra* [Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 927 (2d

Cir. 1968)]; Southern Alameda Spanish Speaking Organization v. City of Union City, California, 424 F.2d 291 (9th Cir. 1970) . . . .", 436 F.2d at 114.

might lead to the conclusion that *any* governmental action which has *any* adverse effect upon minorities can be classified as suspect thereby requiring the governmental unit to show a compelling state interest for the statute or action under attack. Such a standard would comport with that required when there has been purposeful racial discrimination. It must be borne in mind, however, that this statement was dictum in an opinion finding purposeful discrimination, and further, that the Court did not enunciate the appropriate standard of review to be used in determining the validity of actions which are discriminatory in effect but not in intent.

■ A discriminatory effect which violates the Equal Protection clause need not be accompanied by a discriminatory motive. This was made clear by the Supreme Court in Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972):

"But as we said in Palmer v. Thompson, 403 U.S. 217, 225, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438, it 'is difficult or impossible for any court to determine the "sole" or "dominant" motivation behind the choices of a group of legislators,' and the same may be said of the choices of a school board. . . . Thus, we have focused upon the effect —not the purpose or motivation—of a school board's action in determining whether it is a permissible method of dismantling a dual system. The existence of a permissible purpose cannot sustain an action that has an impermissible effect." 407 U.S. at 462, 92 S.Ct. at 2203.

To the extent that *Lackawanna, supra,* and its progeny suggest that a discriminatory effect is subject to strict scrutiny in the absence of any discriminatory intent, these cases must be viewed in light of James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), and Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971). *James* and *Palmer* hold that a seemingly neutral policy which affects the majority as well as a minority, but which has a greater practical impact or places a greater burden on the minority, is not thereby invalid. In *Palmer, supra,* the Court applied the "rational basis" rather than the compelling interest test in upholding Jackson, Mississippi's closing of its municipal pools because they could not be run safely and economically on an integrated basis. In so doing, the Court seemed to take the position that the greater practical impact on minorities, who have less access to alternative facilities, was not unconstitutional.

■ In *Valtierra, supra,* the Court upheld a provision of the California Constitution requiring a mandatory community referendum on all public housing proposed to be built in the community. In upholding this provision the Court put great emphasis upon the nature of referenda and their importance in a democratic society. The Court, however, did not limit the reach of its decision to cases involving the use of referenda but went on to state:

"[The plaintiffs] suggest that the mandatory nature of the Article XXXIV referendum constitutes unconstitutional discrimination because it hampers persons desiring public housing from achieving their objective when no such roadblock faces other groups seeking to influence other public decisions to their advantage. But of course a lawmaking procedure that 'disadvantages' a particular group does not always deny equal protection. Under any such holding, presumably a State would not be able to require referendums [sic] on any subject unless referendums [sic] were required on all, because they would always disadvantage some group. And this Court would be required to analyze governmental structures to determine whether a gubernatorial veto provision or a filibuster rule is likely to 'disadvantage' any of the diverse and shifting

groups that make up the American people.

.    .    .    .    .    .

"The people of California have also decided by their own vote to require referendum approval of low-rent public housing projects. This procedure ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues. It gives them a voice in decisions that will affect the future development of their own community.
.    .    ." 402 U.S. at 142–143, 91 S. Ct. at 1334.

This decision undercuts the dictum of *Lackawanna*. To the extent that other cases, including most recently Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F.Supp. 1245 (N.D.Ohio 1973), take a contrary position, this Court must respectfully disagree. In view of *Valtierra* and *Palmer,* it appears that in housing, for a racially discriminatory effect to be found, there must be some showing that a policy or activity which has a racially discriminatory effect results from a prior pattern of discrimination or that such policies affect only racial minorities. To the extent that other courts have carried the idea of "discriminatory effect" in the housing field further, this Court rejects the position they have espoused while again noting that the decisions turned on their individual facts. To hold that any action or failure to act is unconstitutional because it has an adverse effect on minorities, even though it affects members of the majority as well—albeit to a lesser degree—would be carrying the idea of discriminatory effect too far. Under such an approach a governmental unit could never stop a program for entirely sound reasons even at an early talking stage if it would deprive minorities of something they would have had if the program came to fruition.

In the instant case, the Riverdale community is about 97% white and contains no subsidized housing. No evidence was introduced to show why there is almost a totally white population there, while the City as a whole is about one-third black or Hispanic. The Court simply cannot conclude on the basis of the evidence before it that the racial composition of the community is a result of illegal racial discrimination. To the contrary, the historical context within which the Faraday Wood project was contemplated indicates a desire and attempt on the part of the named defendants to achieve some semblance of integrated housing.

■ The Court takes judicial notice that a majority of tenants and applicants for low-rent public housing are members of minority groups. The Court recognizes that their access to decent, safe, and sanitary housing, especially outside the ghettos, is difficult, if not non-existent. But it is also apparent that the prospective middle-income tenants have also been deprived of the opportunity to live in Riverdale. The latter, of course, have a wider choice of housing options than do the minority poor; but the result is similar to that in *Palmer, supra,* in which the deprivation of use of swimming pools which affected both black and white fell more heavily on blacks. Since the defendants ceased to process the Faraday Wood project on non-racial, albeit political, grounds, that this act may cause greater harm to minorities is not a constitutionally invalid discriminatory effect.

■ It should be noted that the standard of review in Equal Protection cases is in a state of chaos. The *Lackawanna* case, *supra;* and United States ex rel. Chestnut v. Criminal Ct. of City of N. Y., 442 F.2d 611 (2d Cir. 1971) look to the rational basis test at least in the absence of a *prima facie* showing of racial discrimination. *See also* Pride v. Community School Board of Brooklyn, New York, School District #18, 482 F. 2d 257 at 268 (2d Cir. 1973). Absent this *prima facie* showing of racial discrimination or the denial of a fundamental constitutional right, the courts continue to apply the "rational basis" test, although it is frequently difficult to discern which test is being applied. How-

ever necessary housing may be it still falls within the area denominated by the Supreme Court as "economics and social welfare" and not the area carved out for special scrutiny known as "fundamental rights." *See,* Dandridge v. Williams, 397 U.S. 471, 484–486, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).[3]

Plaintiff AMIH's due process and contract claims, being dependent on proof that HDA ceased to process the Faraday Wood project for illegal reasons, must also fail, even assuming, *arguendo,* that a valid and binding contract existed between AMIH and HDA.

The complaint is dismissed in all respects. The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed.R.Civ.P.

Settle judgment on notice.

---

3. In the absence of proof of racial discrimination, the other possible discrimination which could be adduced is discrimination on the basis of wealth, since this project involved government subsidy and income ceilings. Plaintiffs did not adduce proof to support this contention. Furthermore, the Court finds that even if such proof had been adduced, discrimination against the poor at best falls under the rational basis rubric. *See,* San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973).