JOSEPH SKILLKEN AND CO. et al.,
Plaintiffs-Appellees,

v.

CITY OF TOLEDO et al., Defendants,

and

Ragan Woods Homeowners Association, Inc., et al.,
Intervenor-Defendants-Appellants.

JOSEPH SKILLKEN AND COMPANY et al., Plaintiffs-Appellees,

v.

CITY OF TOLEDO et al.,
Defendants-Appellants.

Nos. 74–2116, 74–2320.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 3, 1975.

Decided Dec. 10, 1975.

William S. Boggs, Richard T. Bauer, Boggs, Boggs & Boggs, Ralph S. Boggs, Toledo, Ohio, for appellants in 74–2116.

Joseph R. Tafelski, R. Michael Frank, Joseph F. Vargyas, Toledo, Ohio, Jay Mulkeen, Washington, D. C., Theodore M. Rowen, William M. Connelly, Toledo, Ohio, Martin E. Sloane, Michael B. Barton, National Committee Against Discrimination in Housing, Washington, D. C., for plaintiffs-appellees in both cases.

Joseph P. Jordan, John D. Scouten, Law Dept., Toledo, Ohio, for defendants-appellants in both cases.

Before PHILLIPS, Chief Judge, WEICK, Circuit Judge, and MILES,[*] District Judge.

WEICK, Circuit Judge.

These two appeals were consolidated for oral argument.

They involve important questions of law in a low income public housing suit brought under 42 U.S.C. §§ 1401 *et seq.*, §§ 1981–1983, 2000d *et seq.*, and §§ 3601 *et seq.*, concerning the propriety of a mandatory injunction issued by the District Judge commanding the governing body of the City of Toledo, Ohio, namely, the members of the City Council, to rezone by a spot zoning ordinance an area in the neighborhood of expensive residential property in the Ragan Woods Addition, which area had been zoned previously under Toledo's comprehensive zoning ordinance. The mandatory injunction also required the defendants to approve a preliminary plat for that area, and for two other areas of the city, all to accommodate the construction of one hundred forty-five Turnkey III low cost public housing units in said areas.

They further involve the propriety of the order of the District Court, not considered in its published opinion, requiring the City Council to submit to the Court, within 90 days, a comprehensive plan for the integration of the residential neighborhoods of the City of Toledo.

The property owners in the Ragan Woods Addition filed a motion to intervene as defendants in the suit against the municipal defendants, on the ground that to change the existing comprehensive zoning ordinance to accommodate the construction of low cost housing would depreciate substantially the values of their properties. The motion to intervene, together with a proposed answer to the complaint, was promptly filed within three days after the municipal defendants had filed their answers to the complaint.

The District Judge summarily denied the motion without even a hearing, the grounds for denial being that it was untimely filed, that the property owners did not have sufficient interest, and that they were adequately represented by counsel for the municipal defendants.

Appeals were taken to this Court by the property owners who were denied intervention in case number 74–2116, and by the municipal defendants in case number 74–2320.

The municipal defendants moved for a stay of the District Court's mandatory injunction pending appeal, which stay was granted by the District Court, but only on condition that the City of Toledo execute a supersedeas bond in the amount of $880,709.[1] The City promptly posted the bond.

The plaintiffs in the case were Joseph Skillken & Company (Skillken), a Columbus, Ohio corporation, engaged in the development and construction of residential housing units, Toledo Metropolitan Housing Authority (TMHA), Jose Maldonado and Barbara Talley, a Mexican American and a Negro, on behalf of themselves and other low income minorities living in Toledo, and who allegedly are in need of housing.

---

[*] The Honorable Wendell A. Miles, Judge, United States District Court for the Western District of Michigan, sitting by designation.

1. Revised Code of Ohio, Sec. 2505.12 exempts the state and municipalities and their officers from giving bonds. See *Sharon Realty Co. v. Westlake*, 114 Ohio App. 421, 182 N.E.2d 876 (1961). Similarly, Rule 62(e) of the Fed.R. Civ.P. exempts the United States or its officers or agencies. 28 U.S.C. § 2408.

In *Marrow v. City of Ferguson*, 114 F.Supp. 755, 756 (E.D.Mo.1953), aff'd, 210 F.2d 520 (8th Cir. 1954), the District Court, under Missouri statutes similar to Ohio's, held that the statutes created substantive rights, not merely procedural, and dispensed with bond in an appeal.

Furthermore, the District Court had previously bifurcated the damage issues from the injunctive issues, and no damages had been awarded. The record does not disclose any question about the solvency of the City or its ability to respond in damages. It is not understandable, in any event, why such a high bond was required. The District Court even had discretion to issue the stay without any bond, in the absence of proof of likelihood of harm. *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780 (10th Cir. 1964).

The defendants were the City of Toledo, its Mayor, and the individual members of its Plan Commission and City Council. Skillken and TMHA were each represented by their own attorneys. Maldonado and Talley were represented by the attorneys of Advocates for Basic Legal Equality and the National Committee Against Discrimination in Housing. The municipal defendants were represented by the Director of Law of the City and his assistants.

The City had entered into a co-operation agreement with TMHA on August 12, 1968.[2] TMHA sought and received a reservation of funds from the Department of Housing and Urban Development (HUD) for the construction of 150 units of single-family low-income housing units under the Turnkey III Program. TMHA thereafter advertised for proposals on the 150 units. Skillken responded to the advertisement by submitting to TMHA a proposal for the construction of 140 units of single-family housing. The proposal was accepted and a letter designating Skillken as the Turnkey III developer was issued by the Director of TMHA. Under the Turnkey III Program the developer is responsible for securing sites and obtaining all necessary zoning and platting approvals.

Following discussions among Skillken, TMHA, and staff members of the Plan Commission, three sites were chosen upon which to construct the proposed public housing units. Skillken then entered into option contracts for the acquisition of real property to build as follows:

50 units of public housing on the Heatherdowns Boulevard site (hereinafter Heatherdowns);

46 units of public housing on the Holland-Sylvania site (Holland-Sylvania); and

34 units of public housing on the Stateline Road-Lewis Avenue site (Stateline).

In December, 1973 Skillken requested approval from the Plan Commission for the preliminary platting of the three proposed sites. Simultaneously Skillken petitioned the Plan Commission for a rezoning of the Heatherdowns site from an R–A residential classification of 20,000-square foot lots to an R–2 residential classification of 6,000-square foot lots, which would permit construction of fifty single-family low income housing units on lots of much smaller dimension than authorized by existing zoning. Zoning changes were not required for the Holland-Sylvania or Stateline sites, since existing zoning accommodated the proposals.

On January 24, 1974 the Plan Commission's staff conditionally recommended, and the Plan Commission accepted, the preliminary plat for the Holland-Sylvania site.[3] During this meeting consideration was given to the preliminary platting of the Stateline site, but action was deferred until February 7, 1974 when the Plan Commission met to consider the preliminary platting of the Stateline and Heatherdowns sites.

Residents from these areas attended the meeting and voiced strong disapprov-

2. The 1968 co-operation agreement superseded a previous co-operation agreement entered into in 1938, which was amended in 1940.

Under the 1938 agreement sites selected for low-rent public housing required consent of the City of Toledo. The 1968 agreement gave the City no such authority to approve sites. *Davis v. City of Toledo*, 54 F.R.D. 386 (N.D. Ohio, W.D.1970).

3. Preliminary platting is required under the Subdivision Rules and Regulations of the City of Toledo. Ohio Revised Code makes no provision for preliminary platting. Because the

development of a legal plat is complicated and expensive the Plan Commission established a practice under which a developer may secure approval for a preliminary plat before going to the expense of preparation of a complete plat. Whatever conditions the Commission might require in order to approve the preliminary plat could then be met in the final plat.

Prior to this time the Plan Commission was unaware that public housing was to be constructed on the sites because the staff had neglected to advise it of that fact.

al of the construction of public housing units because of the potential water drainage problems that higher density dwelling units would cause. Additional objections will be discussed later in this opinion.

The Plan Commission deferred action until its March 7, 1974 meeting, at which time it rejected Skillken's petition for the platting of the Stateline site on the basis that "[I]t is not in the best interests of the residents in that area . . . ." The Plan Commission also rejected the petition for platting and the request to rezone the Heatherdowns site for the reason that "[T]he subdivision as presented . . . does not meet the area requirements for the zoning. . . ."

Following this action by the Plan Commission the Toledo City Council preliminarily denied Skillken's request to rezone the Heatherdowns site on March 19, 1974. On March 21, 1974 the Plan Commission rescinded its prior approval for the Holland-Sylvania site, and on March 26, 1974 the Council formally rejected Skillken's request for rezoning the Heatherdowns site by passage of Resolution 1–74.

On May 28, 1974 the plaintiffs filed the present suit.

They sought a mandatory injunction to compel the members of the City Council of Toledo to rezone and plat the Heatherdowns site and to approve a plat for the Holland-Sylvania and Stateline sites so as to permit the construction of 130 low cost public housing units on said sites.

It was alleged that the action of the City Council and the Plan Commission was racially motivated by intentional and purposeful discrimination against black people who were in need of public housing.

The District Judge in his published opinion found a purposeful and intentional discrimination against black people on the part of the City Council and the Plan Commission, and directed counsel for plaintiffs to prepare an order granting relief to the plaintiffs.

The order, which was approved by the Court and entered on October 8, 1974, however, substantially deviated from the Court's published opinion. It provided that the defendants' acts—

. . . without any regard to the defendants' intentions or motivations, are and have the effect of being racially discriminatory, of perpetuating racial residential segregation and that these actions deny plaintiffs and the members of their class equal housing opportunities. . . .

Thus, "in effect" discrimination was added, whereas the previous ground was purposeful and intentional discrimination, which was not proved.

But this was not all. The entire nature of the case was changed by the following order (which was not in the published opinion):

### AND IT IS FURTHER
### III

ORDERED that in order to eliminate the past and continuing effects of racial residential segregation, the defendants shall, after consultation with plaintiffs, submit to this Court within ninety (90) days after the entry of this order, a comprehensive plan whereby the defendant City of Toledo and Toledo City Plan Commission, their members, officers, agents, employees, and all persons acting in concert and participation with them, shall affirmatively engage themselves in substantial efforts to eliminate discriminatory barriers in the total housing supply and make housing in a broad choice of neighborhoods freely and fully available to minority persons.

### AND IT IS FURTHER

ORDERED that following defendants' submission to the Court of the above plan, plaintiffs may submit to the Court within twenty (20) days thereafter any objections or alternative suggestions to such plan. (A. 64–65)

These provisions were patterned after orders in school desegregation cases. They actually ordered integration of the

residential neighborhoods of the entire city of Toledo, by means of low cost public housing, at public expense, and irrespective of zoning ordinances.

## I

### THE ATTEMPTED INTERVENTION APPEAL No. 74–2116

As before stated, the motion to intervene was filed within three days after the answer to the complaint was filed by the municipal defendants.

The motion was filed by four individual property owners and by the Ragan Woods Homeowners Association, representing about 140 owners of property in the Ragan Woods Subdivision, who are members of this class. The motion stated that there are questions of law and fact common to the class.

The common question of law and fact is the propriety of the actions of the municipal defendants in disapproving the requested rezoning and plat proposals for the Heatherdowns site referred to in the complaint.

The motion further stated that as neighboring property owners they would be damaged by the proposed zoning change and that they have rights and interests protected by statute and are entitled to intervene as a matter of right. They state that disposition of the present suit may impair or impede their ability to protect their interests. They also assert that they have a permissive right to intervene as shown by their proposed answer to the complaint, a copy of which was attached to the motion to intervene.

In their answer the intervenors state among other things that the Heatherdowns Boulevard site was zoned R–A for single-family residences, with minimum lot areas per family of 20,000-square feet and minimum lot width of 100 feet.

It is alleged that this zoning was proper and conformed to the most desirable, appropriate, and best use of the property affected thereby at the time it was zoned.

They allege that the individual property owners and the class they represent have expended over $10,000,000 in development of their respective properties in reliance on the existing zoning ordinances, and since said zoning there has been no zoning change of any part of the Ragan Woods-Heatherdowns area to R–2, 6,000-square foot lots, as requested by plaintiffs and denied by the co-defendants.

They allege that the proposed zoning change would constitute "spot zoning", and that as a result the intervenors and others will suffer great deterioration and diminution in value of their respective properties, and that they will be irreparably damaged, for which they have no adequate remedy at law.

Since the District Judge summarily denied the motion to intervene without a hearing and without taking evidence, we must assume that the factual allegations in the motion and in the accompanying answer are true.

Intervention as of right is governed by Rule 24(a) of the Federal Rules of Civil Procedure, which provides:

(a) **Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In our opinion the District Judge erred in ruling that the application to intervene was untimely. It was filed within only three days after the municipal defendants had answered. Discovery had just been started. Counsel for the intervening petitioners had indicated that he would not ask for any delay in the expedited trial.

In *Wolpe v. Poretsky,* 79 U.S.App.D.C. 141, 144 F.2d 505 (1944), intervention was permitted even after judgment in order to permit an adjoining property owner to appeal in a suit brought to enjoin enforcement of a zoning order which affected the value of adjoining property, and the Zoning Commission had decided not to appeal from an adverse judgment of the District Court.

We also note that without permitting the neighboring property owners to intervene and protect their property rights, the District Judge in his Memorandum Opinion commented on their conduct, as well as that of the public officials who are the defendants, stating:

> The records of the hearings before the Commission and the Council are a sad display of bigotry, intolerance, and selfishness at its worst. With a great, but totally hypocritical, show of piety, public officials and neighboring property owners pretended that to develop groups of dwellings would only create new ghettoes and that acceptable minority housing can only be obtained by building or buying individual houses throughout the city, or better still, by going out into the suburbs or rural areas beyond the city. The evidence in this case leaves no doubt that the actions and attitudes which have created segregation in Toledo are so strong and so persistent that only very positive court action can change the present housing patterns. (380 F.Supp. at 231)

Thus the Mayor of Toledo, the members of the City Council and the Plan Commission are all tarred with "bigotry, intolerance, and selfishness at its worst." The public officials and the neighboring property owners who were attempting to protect their properties from serious diminution in value were branded as hypocrites feigning a show of piety.

Rule 24(a) requires that the applicant claim an interest relating to the property or transaction which is the subject of the action.

The change in zoning was from lots of 20,000 square feet with 100 feet frontage, to lots of only 6,000 square feet. This would permit the construction of fifty low cost homes in a neighborhood where homes costing from $75,000 to $100,000 have been built. The motion to intervene alleges facts which have not been contradicted that the change in the zoning law will result in a serious and substantial diminution of value of the properties in the Ragan Woods Subdivision.

We look to the law of Ohio for guidance as to the rights of property owners who have purchased and developed their properties relying on existing zoning ordinances.

Revised Code of Ohio § 713.13 provides:

> No person shall erect, construct, alter, repair, or maintain any building or structure or use any land in violation of any zoning ordinance or regulation enacted pursuant to sections 713.06 to 713.12, inclusive, of the Revised Code, or Section 3 of Article XVIII, Ohio Constitution. In the event of any such violation, or imminent threat thereof, the municipal corporation, or the owner of any contiguous or neighboring property who would be especially damaged by such violation, in addition to any other remedies provided by law, may institute a suit for injunction to prevent or terminate such violation.

It will be noted that this statute grants to contiguous or neighboring property owners the right to institute a suit for injunction to prevent not only a violation but also a threatened violation.

The present suit in the District Court was not only a threatened violation but also it has actually resulted in a nullification of the zoning ordinance on which the property owners relied in the purchase and development of their properties.

Even prior to the enactment of Revised Code of Ohio § 713.13 the Ohio courts had upheld the right of a property owner to bring a suit to enjoin the erec-

tion of a structure in violation of a zoning ordinance.

In *Pritz v. Messer*, 112 Ohio St. 628, 149 N.E. 30 (1925), the Supreme Court of Ohio, in an opinion written by Judge Florence Allen, who later was appointed to our Court, held:

A property owner, residing in a municipality in which a valid zoning ordinance is in full force and effect, has legal capacity to apply for an injunction against the erection of an apartment building upon a lot contiguous to her real property, upon the ground that the proposed structure will violate the zoning ordinance. (Syl. 3)

In *Rosenberg v. Mehl*, 37 Ohio App. 95, 174 N.E. 152 (1930), the Court held:

In landowner's suit to have zoning ordinance declared unconstitutional, court abused its discretion in overruling contiguous property owner's motion to be made party defendant . . . . (Syl. 2)

The Court said at page 99, 174 N.E. at 153:

If the court of common pleas should grant the relief asked for, it would certainly deprive the plaintiff in error Rosenberg of his rights declared under the decision in the case of *Pritz v. Messer*. He would be barred from prosecuting an injunction to enforce the observance of the zoning laws as existing under the ordinances of the city, as this would mean an injunction against the carrying out of a judgment of a court of record, which judgment would be determinative of facts giving rise to plaintiff in error's cause of action. (*Id.* at 99–100, 174 N.E. at 153)

Revised Code of Ohio § 713.13, enacted subsequent to *Pritz* and *Rosenberg,* extended the coverage from contiguous to neighboring property owners.

So, in the present case, like *Rosenberg,* the denial of the motion to intervene has barred the property owners "from prosecuting an injunction to enforce the observance of the zoning laws as existing under the ordinances of the city . . . ."

It is interesting to note that the Court of Appeals for the District of Columbia, in *Wolpe v. Poretsky,* 79 U.S.App.D.C. 141, 144 F.2d 505, *cert. denied,* 323 U.S. 777, 65 S.Ct. 190, 89 L.Ed. 621 (1944), cited *Rosenberg* as authority, in footnote 4. The Court held:

Rule 24(a) of the Federal Rules of Civil Procedure 28 U.S.C.A. following section 723c, provides for intervention of right "upon timely application * * when the representation of the applicant's interest by existing parties is or may be inadequate *and the applicant is or may be bound by a judgment in the action ;"* [italics supplied]. It seems clear that a judgment which declares a zoning order to be void would bind adjoining property owners to the extent of taking away their statutory right to an independent action based on the order. Otherwise, adjoining property owners could relitigate the issues in the case any time the plaintiff began construction, on the theory that their right to bring an independent action was not concluded by the decree. (*Id.* at 507)

As previously stated in *Wolpe,* the intervention was allowed after judgment so that the intervenor could appeal from a judgment from which the Zoning Commission should have appealed.

In our opinion the decisions of the Ohio courts in *Pritz* and *Rosenberg* and of the Court of Appeals for the District of Columbia in *Wolpe,* can further be justified on the ground that intervention was necessary to accord the property owners due process of law guaranteed by the Fifth Amendment.

In *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965), Mr. Justice Stewart, who wrote the opinion for the Court, stated:

A fundamental requirement of due process is "the opportunity to be heard." *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363. It is an opportunity which must

be granted at a meaningful time and in a meaningful manner.

It is next contended that the property owners would be adequately represented by the Law Director and his assistants who were representing the City of Toledo, the Mayor, the City Council, and the Plan Commission. We disagree.

The municipal defendants were charged with maintaining a segregated city, and with racial bigotry, bias, hypocrisy, and with discrimination against Negroes.

There was no proof that race had anything to do with the adoption of the existing comprehensive zoning ordinance in effect at the present time. The plaintiffs were claiming that because of the conduct of the officials they were entitled to have the area rezoned.

The property owners, on the other hand, were interested solely in protecting the values of their own property which they did not want to be diminished by a change in the zoning.

The municipal defendants had enough to do to defend themselves against the charges leveled against them by the plaintiffs. They do not have the same interest in protecting the values of the homeowners' properties as do the homeowners themselves.

The defendants, City of Toledo, *et al.,* filed in the District Court a memorandum in support of the motion to intervene. They gave as the reason:

. . . [T]he interests of the Intervenor-Defendants may well be different if not inconsistent with the interests of the Defendants, City of Toledo, et al., and therefore their interests may not be adequately represented by the present defendants.

This was plain notice to the District Judge that the attorneys for the City of Toledo, *et al.,* did not want to represent the property owners; that the interests of their clients may well be different, if not inconsistent, with the interests of the property owners; and that, therefore, their interests may not be adequately represented.

It is not understandable that the District Judge under these circumstances would deny the motion to intervene when he was advised of a conflict of interest, which would have made it unethical for the City attorneys to represent the property owners without their consent. Canons of Professional Ethics of American Bar Ass'n, No. 6.

The City's Attorneys already had their hands full in representing the Plan Commission. The staff of the Plan Commission was co-operating with Skillken, *et al.,* and did not at first disclose to the Plan Commission the fact that the Skillken proposal was a TMHA Housing Project.

Under these circumstances we do not indulge in the presumption, suggested by plaintiffs, that the City, *et al.,* would adequately represent the property owners.

Reliance on our decision in *Woodland Market Realty Co. v. City of Cleveland,* 426 F.2d 955 (6th Cir. 1970), is misplaced. In *Woodland* property was condemned for urban renewal and a company owning a leasehold interest in the neighborhood claimed to be damaged because its customers had been removed. Its leasehold interest in the land remained intact.

In the present case the City of Toledo would not have any right to change the existing zoning ordinance after property owners had purchased their property relying on it, without first resorting to appropriate procedures. As we will point out later, neither did the District Judge, in attempting to exercise legislative functions, have any such right.

## II

The City of Toledo is a municipal corporation with Home Rule Powers of self-government conferred on it by Article XVIII § 3 of the Constitution of Ohio. These powers are defined in its Charter which grants full power to the City to pass such ordinances as are expedient for maintaining and promoting the peace, good government and welfare of the City.

The zoning ordinance is codified in Chapter 9 of the Toledo Municipal Code, and it divides the City "into districts in accordance with a comprehensive plan for the purpose of limiting and regulating the height, bulk and location of buildings, set back building lines, area and dimensions of yards and other open spaces, and the use of buildings and other structures and of premises in such zones or districts, . . . all of which is done in the interest of the public health, safety, convenience or general welfare."

The Toledo ordinance requires notice to be given to the owners of adjoining, adjacent and neighboring land of any hearings on rezoning.

The hearings on the preliminary platting were conducted before the Plan Commission, and hearings on the rezoning were conducted before the City Council. Property owners from the areas of all of the three projects attended en masse and vigorously protested. They were all permitted to be heard. Skillken's attorney also attended and presented his views in favor of the platting and the rezoning.

No representative of TMHA appeared at any of the hearings before the Plan Commission or the City Council to support the rezoning and the platting.

The property owners voiced their objection to all three projects on the ground that the projects would seriously depreciate the value of their homes. Objection to the Stateline Road project was made also on the grounds of poor soil conditions and flooding.

The Plan Commission disapproved of the preliminary platting of the two projects. The City Council, by Resolution 1–74, rejected the rezoning of the Heatherdowns project.

The reasoning for the disapproval of the preliminary platting by the Plan Commission and for the rejection of the rezoning of the Heatherdowns site by the City Council is set forth at length in the transcripts of hearings before those bodies and in the testimony by way of deposition of Stratman Cooke, a member of the Commission and now its Chairman. Chairman Cooke is a Negro. The action of the Commission was by a unanimous vote.

These reasons were substantially as follows:

1— The TMHA projects in recent years had been a dismal failure. Projects had been started and were not completed. Projects which had been completed were unoccupied. Evidence of these facts was proffered when the Court rejected it as irrelevant.

2— The clustering of forty to fifty units of low-income housing was not the proper approach for the entire city as it created an isolated neighborhood within a neighborhood. The Commission suggested that developers be required to include some low-income homes in each new development. They also suggested an extension of TMHA's leased housing project and the building of public housing on scattered individual sites to distribute low-income housing throughout Toledo.

3— TMHA has neglected to meet with residents in the area of the proposed projects to explain their virtues and to endeavor to overcome any resistance.

4— The proposed projects would not produce orderly development of the land to obtain harmonious and stable neighborhoods, and were not in the best interests of the public.

5— There was doubt about the adequacy of the Stateline site based on reports of neighbors as to past flooding and landfill problems.

All of these matters were required to be considered by the members of the Plan Commission and the City Council in the performance of their duty. None of them has any racial overtones.

It is also significant that neither Skillken or TMHA endeavored to meet with either the Plan Commission or the City Council after the rejection to work out a better and more acceptable plan for public housing.

We note that the District Judge passed upon evidence considered by the Plan Commission and the City Council, but he reached a different conclusion. The trouble is that he was not a member of either body, and further, he had no appellate jurisdiction to review their decisions.

The District Judge held that Resolution 1–74 enacted by City Council, denying rezoning of the Heatherdowns tract, was illegal and void. For the reason stated in this opinion we disagree.

But assuming that Resolution 1–74, denying rezoning, was invalid, it would follow that the valid existing zoning ordinance requiring 20,000-square foot lots with 100-foot frontage, would remain in full force and effect. This result, however, did not bother the District Judge. He simply ordered the City Council to pass another ordinance to rezone the tract to 9,000-square foot lots. The figure of 9,000 square feet was used rather than the figure of 6,000, contained in the written petition for rezoning, because counsel for Skillken had indicated that the higher figure was acceptable.

It is clear that in ordering the members of the City Council to pass a new zoning ordinance, the District Judge was exercising legislative powers which he did not possess.

We commented on this in *Mahaley v. Cuyahoga Metropolitan Housing Authority,* 500 F.2d 1087, 1092 (6th Cir. 1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 804, 1975, as follows:

> In oral argument one of counsel for appellees even went so far as to suggest that the single Judge could order individual councilmen to vote for a co-operation agreement. While this course of action might have been a way to order relief without exceeding jurisdictional bounds, we think such action would have been highly improper. Quite simply, it would have been a violation of the separation of powers with the court acting as a legislature.

The Supreme Court in *Griswold v. Connecticut,* 381 U.S. 479 at 482, 85 S.Ct. 1678 at 1680, 14 L.Ed.2d 510 at 513 (1965), used much stronger language than we did in *Mahaley, supra.* Mr. Justice Douglas, speaking for the Court, said:

> We do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions.

With equal propriety the members of Congress could be sued individually and charged with racism, hypocrisy, and bigotry and ordered by a Court to enact new legislation increasing economic and social programs for minorities.

Federal Courts do have jurisdiction and power to pass upon the constitutionality of Acts of Congress, but we are not aware of any decision extending this power in Federal Courts to order Congress to enact legislation. To do so would constitute encroachment upon the functions of a legislative body and would violate the time-honored principle of separation of powers of the three great departments of our Government. This principle is equally applicable to the power of a Federal Judge to order a state legislative body to enact legislation. The enactment of legislation is not a ministerial function subject to control by mandamus, prohibition or the injunctive powers of a court.

### III

Toledo's population in 1970 was 329,068, of whom 86% were white, 14% were black, and 1% other minority groups. 28% of the population, or 35,000 households, were eligible for public housing; 21% of those eligible were black, and 79% were white. Thus there are more than three times as many whites who need public housing than there are blacks needing housing.

The District Judge found that Toledo was a racially segregated city, with public officials who were bigots. He determined that the action of the Plan Commission and of the City Council was racially motivated. He also paid his respects to TMHA, stating:

This example of bureaucratic ducking is typical of TMHA's pusillanimous approach to its responsibilities.

The fact is that black families are living in virtually all parts of Toledo. This was testified to on cross-examination of plaintiff's witness, Emerson Cole, a black member of Ohio Civil Rights Commission, who had lived in Toledo for forty-three years, and who testified as follows:

Q. It is a fact, is it not, that there are black people living in virtually every area of the city of Toledo?

A. Yes. (88a)

Mr. Cole further testified that Toledo had set up a Board of Community Relations, dedicated to resolve problems of housing discrimination, which Board works with him. (88a).

This can hardly be the work of bigoted public officials.

■ The fact that some black people, but not all, are concentrated in a certain area of the city, is no proof of official discrimination, and the District Judge was in error in inferring it.

Nor can the municipal defendants be held responsible for private discrimination or for discrimination by other bodies, or for the location of public housing. The present cooperation agreement did not give the defendants any voice in the selection of sites for housing.

Negro families have not been excluded from the Ragan Woods subdivision, nor have other minorities who have the money to purchase property there. In Ragan Woods there are also first and second generation Americans of Greek, Italian, Polish, Hungarian, Czechoslovakian, Irish, English, Swedish, and Scottish descent.

■ The District Court erred in applying the compelling interest test, rather than a rational basis test, in determining whether Toledo's legislation was invalid. The ruling conflicted with our decision in *Mahaley v. Cuyahoga Metropolitan Housing Authority, supra.*[4]

■ *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), holds that no one has a constitutional right to adequate public housing. We rely also on *Citizens Comm. for Faraday Wood v. Lindsay,* 362 F.Supp. 651 (S.D.N.Y.1973), which has since been affirmed by the Second Circuit Court of Appeals, 507 F.2d 1065 (2d Cir. 1974).

In *Faraday Wood* Judge Lumbard stated:

However, even if we adopted the standards of these cases the plaintiffs have failed to show that the city acted in bad faith. AMIH knew that this proposal had to be approved by the New York City Board of Estimate before the parties could enter into a binding contract. The Board of Estimate is a political body so AMIH knew that it would consider expressions of opinion by members of the public. It seems to us that it is a proper exercise of discretion for HDA to terminate a project when it feels that the Board of Estimate is unlikely to approve it because of public protest and political considerations. (507 F.2d at 1072)

In *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the Court held that a neutral policy which had a greater impact on a minority group was not invalid.

■ The zoning laws in the present case are not inherently suspect. To apply the compelling interest test would virtually invalidate all forms of state legislation where people are affected differently.

The compelling interest rule was rejected in *Village of Belle Terre v. Bo-*

4. Even applying the the compelling interest test, it is clear that Toledo had a valid public interest to protect its zoning laws from wholesale nullification, a result which would disrupt the entire community and would inflict heavy losses on many innocent people. Such zoning laws, enacted under the police power, "are essential to orderly community development." *Forest City Enterprises, Inc. v. Eastlake,* 41 Ohio St.2d 187, 189, 324 N.E.2d 740, 743, *cert. granted,* Oct. 14, 1975, 423 U.S. 890, 96 S.Ct. 185, 46 L.Ed.2d 121.

raas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *James v. Valtierra,* 402 U.S. 137, 142, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Citizens Comm. for Faraday Wood v. Lindsay, supra; Ranjel v. City of Lansing,* 417 F.2d 321 (6th Cir. 1969), *cert. denied,* 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390 (1969), *rehearing denied,* 397 U.S. 1059, 90 S.Ct. 1352, 25 L.Ed.2d 680 (1970).

It is significant that no attack has been made here on Toledo's comprehensive zoning ordinance. It was neutral legislation enacted long before the controversy in the present case arose.

The constitutionality of Ohio's zoning laws was first upheld by the Supreme Court in *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). *Euclid* was followed in *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), and most recently in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). In *Belle Terre* Mr. Justice Douglas, who wrote the opinion for the Court, stated:

> We deal with economic and social legislation where legislatures have historically drawn lines which we respect against the charge of violation of the Equal Protection Clause if the law be " 'reasonable, not arbitrary' " (quoting *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989) and bears "a rational relationship to a [permissible] state objective." *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 253, 30 L.Ed.2d 225. (p. 8, 94 S.Ct. p. 1540)

In *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), the Supreme Court upheld California's requirement of referendum approval by the voters of low cost housing. *Cf. Ranjel v. City of Lansing,* 417 F.2d 321 (6th Cir. 1969), *cert. denied,* 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390, *rehearing de-*

*nied,* 397 U.S. 1059, 90 S.Ct. 1352, 25 L.Ed.2d 680 (1970), for referendum on rezoning.

The entire complaint here is that the legislative body of Toledo refused to rezone.

■ In Ohio zoning is a legislative function. *Forest City Enterprises, Inc. v. Eastlake,* 41 Ohio St.2d 187, 324 N.E.2d 740 (1975), *cert. granted,* Oct. 14, 1975, 423 U.S. 890, 96 S.Ct. 185, 46 L.Ed. 2d 121.

■ In our opinion there was a rational basis for the enactment of Toledo's zoning ordinance and also for the actions of the Plan Commission in denying platting and of the City Council in rejecting rezoning of the Heatherdowns project.

Recently the Supreme Court held that plaintiffs bringing suits to compel housing in municipalities must have standing to sue. *Warth v. Seldin,* 422 U.S. 45, 95 S.Ct. 2197, 45 L.Ed.2d 343 (decided June 25, 1975).

Under date of October 14, 1975 the Supreme Court granted certiorari in the case of *Forest City Enterprises, Inc. v. Eastlake, supra,* which invalidated, for violation of the Fourteenth Amendment, a charter provision of a municipality requiring land use changes to be ratified by the voters in a city-wide election.

■ Although the complaint in this case related only to the action of the Plan Commission and the City Council in respect to three sites which Skillken desired to develop, the broad order entered by the District Judge subsequent to his published opinion converted the nature of the case to that of an action to desegregate the residential areas of the entire city of Toledo, and, like the procedure in a school desegregation case, the municipal defendants were ordered to submit to the Court within ninety days a comprehensive plan for desegregation of housing.

Under this broad order all zoning laws in conflict therewith would be invalidated. Low cost public housing could

move into the most exclusive neighborhoods in the metropolitan area and property values would be slaughtered. Innocent people who labored hard all of their lives and saved their money to purchase homes in nice residential neighborhoods, and who never discriminated against anyone, would be faced with a total change in their neighborhoods, with the values of their properties slashed. All of this would be accomplished simply by an order of a Federal Judge, and at the expense of the taxpayers.

It is submitted that Congress never vested any such power in Federal Judges.

■ Members of the City Council did not cause nor create the concentration of black people in Toledo, and they are under no legal obligation to deconcentrate the area or to change the zoning laws to bring about deconcentration.

Nor are the city officials responsible for private discrimination, most of which, we believe, occurred prior to Ohio's Civil Rights Act, Ohio Rev.Code § 4112.01 et seq., and the decision of the Supreme Court in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), which afford adequate remedies for private racial discrimination in housing.

It was argued that housing units were constructed in Toledo in the areas of racial concentration. It should be remembered that ever since the 1968 co-operation agreement the location of housing units was the sole province of TMHA.

■ Nor do we regard the refusal of the City Council to rezone and the Plan Commission to replat, as obstructing the rights of minorities to housing, upon which an inference of discrimination "in effect" may be drawn against those bodies.

■ Nor can the city officials be blamed for the substandard public housing already constructed by TMHA, or for TMHA's failure to complete existing projects, or for TMHA's permitting projects to remain vacant or in a state of disrepair, as was described in proof which was excluded by the District Court but was duly proffered.

■ We live in a free society. The time has not yet arrived for the courts to strike down state zoning laws which are neutral on their face and valid when passed, in order to permit the construction at public expense of large numbers of low cost public housing units in a neighborhood where they do not belong, and where the property owners, relying on the zoning laws, have spent large sums of money to build fine homes for the enjoyment of their families.

■ A federal court ought not to exercise state legislative functions. It is without power to do so, and furthermore it has not developed proficiency in that field.

■ There is not an iota of evidence that any of the property owners ever discriminated against black people, or were in any way responsible for their concentration in certain areas of Toledo. These property owners have constitutional rights just as dear to them as they are to the minorities. Their constitutional rights included the right to own property and not to have its value destroyed without due process of law.

It is submitted that it should not be necessary to violate the constitutional rights of the majority of the population of a city in order to grant relief to a minority group.

■ Relative to the platting of Holland-Sylvania and Stateline sites, the District Court, in our opinion, did not give adequate consideration to the nonracial reasons stated by the Plan Commission and the City Council in denying the platting, and did not consider the rights of these areas' property owners who opposed the platting. These rights must be determined upon the remand.

The order of the District Court further finds that the City violated the cooperation agreement but does not state in what respect.

The plaintiffs in their brief (p. 23) state that the cooperation agreement—

. . . requires the city to cooperate with TMHA in the development of these units, including the making of reasonable and necessary changes in zoning for the development of TMHA projects.

Plaintiffs neglected to state that such cooperation was limited by the first sentence in the paragraph, which expressly states:

Insofar as the Municipality may lawfully do so . . . .

 It would not be lawful for Toledo to contract away or to restrict its legislative powers, nor to delegate them to TMHA. *Forest City Enterprises, Inc. v. Eastlake, supra;* 10 Ohio Jur.2d, *Constitutional Law,* §§ 239, 315. In *Forest City* the Court stated:

In Ohio, the power to zone or rezone, via the passage or amendment of a comprehensive zoning ordinance, is clearly a legislative function. (41 Ohio St.2d at 189, 324 N.E.2d at 743)

In that case also, the Court cited *Berg v. Struthers,* 176 Ohio St. 146, 198 N.E.2d 48 (1964); *Tuber v. Perkins,* 6 Ohio St.2d 155, 216 N.E.2d 877 (1966); *Donnelly v. Fairview Park,* 13 Ohio St.2d 1, 233 N.E.2d 500 (1968).

 Skillken obviously recognized this fact when he applied to the City Council for rezoning and to the Plan Commission for platting. It would not have been necessary for Skillken to do this if the cooperation agreement validly waived the zoning laws.

The fact is that over the years from 1938 the City did furnish police and fire protection and other services required by the cooperation agreement. It would appear that the only violation claimed by the plaintiffs was that the city did not change its zoning laws and approve preliminary platting, in the present case. It was not required to make such changes unless lawfully approved by the governing body of the city.

The judgment of the District Court is reversed and the cause is remanded for dismissal of the complaint with respect to the rezoning and platting of Heatherdowns.

With respect to the platting of Holland-Sylvania and Stateline sites the cause is remanded for further consideration by the District Court after the parties have endeavored to work out an amicable solution of their problems which include scattered housing sites and housing in new developments, and consideration of the rights of the property owners in the two areas.

Each party will pay his own costs in this appeal.

PHILLIPS, Chief Judge (concurring in the result).

I concur in the results reached in the opinion prepared by Judge Weick.

My opinion is that the record contains no support for the District Court's statement that the actions of the City Council and the Plan Commission were a "sad display of bigotry, intolerance, and selfishness at its worst." 380 F.Supp. at 231. Not only is this finding clearly erroneous, but it is also likely to be counterproductive in the sensitive and controversial circumstances of this case.

I also agree that the record of this case does not provide a basis for the action of the District Court in ordering that the City of Toledo submit a comprehensive plan for the elimination of all discriminatory barriers in housing.

As this court said in *Garrett v. City of Hamtramck,* 503 F.2d 1236, 1249 (6th Cir. 1974), affirmative provisions in a decree "should be no greater than required because courts are ill-equipped to administer the details of a municipality's affairs." In my opinion the requirement that Toledo develop a sweeping plan of affirmative action is unnecessary in this case. More important, it would deeply involve the District Court in complex and delicate problems of city planning that are best left to the municipal government and to the various administrative agencies.

Appeal No. 74–2116 is from the decision of the District Court denying the

petition of Ragan Woods Homeowners Association, et al., to intervene as parties defendant. I agree that these parties had a right to intervene under Fed.R. Civ.P. 24(a) and that the District Court committed reversible error in denying leave to intervene under the facts and circumstances of this case.

I interpret the opinion prepared by Judge Weick to make final disposition of only one issue—the rezoning of the Heatherdowns tract. I agree that the decision of the District Court should be reversed on this issue and that the complaint should be dismissed insofar as it seeks the rezoning and platting of Heatherdowns.

I further agree that the issues of platting the Holland-Sylvania and Stateline sites should be remanded for further consideration after the parties have endeavored to work out an amicable solution to their problems. All the parties to this appeal are, or should be, interested in the development of the City of Toledo, where all citizens, black and white, will have equal opportunities for adequate housing, without discrimination. The parties are, or should be, interested in avoiding a situation for Toledo such as is described in *United States v. City of Black Jack, Missouri,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). These are problems that should be resolved effectively by persons of good will, working at the level of local government, and not by mandates of federal courts.

If parties are not successful in working out an amicable settlement of their differences, the District Court will have another opportunity to pass upon the issues in the light of all evidence then on file, including the evidence heard on remand.